IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COMMUNICATION WORKERS OF AMERICA LOCAL 3204, COMMUNICATION WORKERS OF AMERICA LOCAL 3204 RETIRED MEMBERS COUNCIL, and BLACK VOTERS MATTER FUND,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia,<br><br>*Defendant*. | Case No. 1:26-cv-_____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs COMMUNICATION WORKERS OF AMERICA LOCAL 3204 ("Local 3204"), COMMUNICATION WORKERS OF AMERICA LOCAL 3204 RETIRED MEMBERS COUNCIL ("CWA RMC"), and BLACK VOTERS MATTER FUND ("BVMF") file this Complaint for Declaratory and Injunctive Relief against Defendant Brad Raffensperger, in his official capacity as the Secretary of State for the State of Georgia, and allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this case to enforce the public inspection provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1).

That provision requires states to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." Plaintiffs requested records from Secretary Raffensperger relating to recent programs and activities his office conducted to remove voters from Georgia's list of eligible voters. As set forth below, Secretary Raffensperger refused to make available for inspection the full scope of records responsive to Plaintiffs' requests, in violation of the NVRA.

2. Secretary Raffensperger's mass voter purge last summer prompted Plaintiffs' requests. Specifically, in July 2025, Secretary Raffensperger issued a press release announcing that his office was conducting an "audit of Georgia's voter rolls" to "clean Georgia's voter lists." As part of that effort, Secretary Raffensperger stated that he intended to send "[c]ancellation mailers" to approximately 480,000 voters registered in Georgia, based on his office's characterization of those voters as being "Inactive."

3. The press release set out four categories of voters whom the Secretary's office identified as "Inactive": (1) voters who were "identified as having moved out of state"; (2) voters who "filed a national change of address (NCOA) with the United States Postal Service"; (3) voters "identified as having no contact with their elections office in 5 calendar years"; and (4) voters "identified because their local elections office received returned undeliverable mail when attempting to mail to the address on record."

4. Secretary Raffensperger also published a list of voters to whom his office intended to send "cancellation mailers" (the "Purge List"). According to the

Secretary, all voters on the Purge List would receive notices indicating that, unless they respond within 40 days, they would be removed from Georgia's voter rolls. The press release boasted that this was "the largest mailing of its kind in eight years." And the Secretary subsequently cancelled the registrations of nearly 471,000 Georgia voters—roughly six percent of all registered voters in the state.

5. The limited information the Secretary's office released to the public raised as many questions as it provided answers. Most notably, the Secretary did not explain in any detail his office's methodology for identifying voters to place on the Purge List. Nor did he provide any details about the mailers to be sent to voters or his office's efforts—if any—to guard against improper removals.

6. These uncertainties prompted significant public concern about the intent and effect of Georgia's mass voter purge. These included concerns about whether the purge would result in the improper removal of eligible voters—particularly minority voters and voters who move frequently.

7. As described in greater detail below, Plaintiffs comprise two Georgia union groups and a nonpartisan, nonprofit Georgia social welfare organization. To protect their members and constituents and advance their missions of increasing voter engagement and political participation both among their members and among Georgians writ large, they submitted a records request under the NVRA to Secretary Raffensperger. *See* **Exhibit A** (Sept. 22, 2025 Ltr. to Sec'y Raffensperger). The letter requested the Secretary make available seven categories of records relating to the recent purge of Georgia's voter list ("Records Requested"). *Id.*

8. The Secretary's response was grossly inadequate and failed to make available for inspection nearly all the records sought in Plaintiffs' requests, even though Plaintiffs are entitled to inspect those records under the NVRA, as set forth below. *See* **Exhibits B & C** (October 9, 2025 Emails).

9. Accordingly, on October 24, 2025, Plaintiffs sent a letter to Secretary Raffensperger notifying him that his office's failure to make available for inspection the records requested violated the NVRA's public inspection provision. *See* **Exhibit D** (October 24, 2025 Ltr. to Sec'y Raffensperger). To date, Secretary Raffensperger and his office have not made available the full scope of requested records or otherwise substantively responded to Plaintiffs' October 24 letter.

10. To enforce the NVRA and to protect their members, constituents, and organizational missions, Plaintiffs bring this case to seek a declaratory judgment that Secretary Raffensperger violated the NVRA's public inspection provision, and injunctive relief requiring him to supply records responsive to Plaintiffs' requests.

## JURISDICTION & VENUE

11. Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, as well as 52 U.S.C. § 20510(b), to redress the deprivation under the color of state law of rights secured by the laws of the United States, including the NVRA, 52 U.S.C. § 20507, *et seq*.

12. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343 because the matters in controversy arise under the laws of the United States and involve the assertion of a deprivation, under color of state law, of a right secured by the laws of the United States.

13. Plaintiffs sent Secretary Raffensperger notice of Georgia's violation of the NVRA's public inspection provision by written letter on October 24, 2025. *See* **Exhibit D**. Secretary Raffensperger did not respond to the notice or otherwise correct the violation within 90 days. Plaintiffs therefore have a private right of action under 52 U.S.C. § 20510(b).

14. Moreover, the Court has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers.

15. This Court has personal jurisdiction over Defendant, who is sued in his official capacity and resides within this State.

16. Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civil Rule 3.1 because Defendant resides in this judicial district and a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district. Further, Plaintiffs all operate within this district and division.

**PARTIES**

17. Defendant Brad Raffensperger is the Secretary of State of Georgia. The NVRA requires each state to designate a chief election official responsible for coordination of the state's responsibilities under the NVRA. 52 U.S.C. § 20509. Georgia law designates the Secretary of State as its chief election official. O.C.G.A. § 21-2-210. Secretary Raffensperger is sued in his official capacity.

18. Communications Workers of America Local 3204 ("Local 3204") is a chartered affiliate of the Communication Workers of America, a labor union

primarily drawing from the telecommunications and media industries. Local 3204 represents over 1,200 members in the Atlanta metro region. Its mission is to help its members live secure and dignified lives in the workplace and beyond. As part of that mission, Local 3204 works to build the political power of its members by registering them to vote, turning them out during elections, and advocating for policies that will improve its members' lives. Local 3204 also participates in significant legislative advocacy and public outreach on issues that are core to its mission, including voting rights. For example, its legislative and political director leads efforts to screen political candidates and endorse those who will best serve Local 3204's members.

19. To further that mission, Local 3204 operates a program that works to ensure its members who are eligible to vote have up-to-date voter registrations, as well as reminding members about methods and schedules for voting. As part of that program, Local 3204 regularly conducts visits to job sites to help members register to vote and to educate them about the best practices for maintaining their status as a registered voter.

20. Accordingly, Local 3204 requested records related to the purge from Secretary Raffensperger's office to determine whether any of Local 3204's members were improperly removed, and also to determine why Georgia voters were being flagged as potentially ineligible, so that Local 3204's voter registration program can take that information into account and avoid those pitfalls when it registers members to vote and educates them about maintaining their voter registrations.

21. The Secretary's wrongful withholding of the records requested directly harms Local 3204 by interfering with and undermining its voter registration efforts.

Without the information contained in those records, Local 3204 is unable to assess in detail what caused voters to be subject to the purge or what steps voters could have taken to avoid having their registrations canceled. As a result, without the requested records, Local 3204 is unable to adapt its voter registration and engagement activities to better insulate its members from improper removals, unable to educate its members on guarding against having their voter registrations canceled (properly or not), and unable effectively engage in public advocacy against erroneous voter purges.

22. Communications Workers of America Local 3204 Retired Members Council ("CWA RMC") is a chartered affiliate of the Communication Workers of America, representing over 3,000 members in the Atlanta metro region. Its mission is to ensure retirees enjoy social and economic justice and the full civil rights that they have earned after a lifetime of work. To advance that mission, CWA RMC dedicates significant resources to registering, engaging, and educating voters—including both its members and other Georgians—as well as political advocacy on issues affecting its members and other Georgia voters. For instance, CWA RMC regularly endorses candidates, campaigns on behalf of candidates, and supports labor-related get-out-the-vote efforts, such as phone banks.

23. CWA RMC is concerned that its members may have been improperly removed by Secretary Raffensperger's purge of Georgia's voter rolls, as CWA RMC has identified numerous members whose registrations were canceled as part of the purge. CWA RMC planned to use the information it obtained to verify that its members and other Georgians were not improperly removed, and, to the extent it

7

found otherwise, take appropriate remedial action. It also planned to use the information it obtained to determine if any of its members were properly removed and to update its voter registration activities to guard against removals going forward.

24. The Secretary's wrongful withholding of the records requested directly harms CWA RMC by interfering with and undermining its voter registration efforts. Without the information contained in those records, CWA RMC is unable to determine whether any of its members subject to the purge were improperly removed and is thus unable to take effective action to redress any such improper removals—including but not limited to assistance with re-registration or outreach to local election officials—compromising its voter registration and turnout programs. Similarly, without the requested records, CWA RMC is unable to educate its members on guarding against improper removals in the future or effectively engage in public advocacy against improper voter purges.

25. Without the requested records, CWA RMC is also unable to assess whether any of its members were *properly* removed from the voter rolls due to defects in their eligibility that can be cured—for example, members who moved may remain eligible to register to vote at their new address, but are unaware that they need to do so. Nor is CWA RMC able to assess, without the records requested, whether any of its members were properly removed because they are in fact ineligible to register to vote. And, like Local 3204, it is unable to adapt its voter registration activities based on information about what prompted voters to be subject

to the purge or what steps voters could have taken to avoid having their registrations canceled.

26.     Black Voters Matter Fund ("BVMF") is a nonpartisan, nonprofit social welfare organization dedicated to building power in the Black community by growing their influence through the ballot box. To support that mission, BVMF engages in voter-registration and get-out-the-vote programming throughout Georgia. BVMF has invested millions of dollars in voter registration and engagement programs across the state, with a particular emphasis on registering and mobilizing communities with large populations of Black voters, such as in the Atlanta metro area and Southern Georgia. Another of BVMF's core functions is educating the public about their rights as voters, state policies that impact them, and the importance of participating in the political process. This also includes engaging in policy advocacy on issues relating to voting. For instance, BVMF has testified and lobbied for and against various voting-related bills at the state, local, and national level. BVMF also organized a multi-state bus tour promoting voter-protection legislation.

27.     BVFM requested records from Secretary Raffensperger to assess whether his office's purge of Georgia's voter rolls resulted in the wrongful cancellation of voter registrations in the communities BVMF serves. If given access to the requested information, BVMF would examine the records to determine whether the Secretary improperly purged members of those communities from the voter rolls. And should BVMF discover wrongful cancellations, BVMF would take remedial action, including, but not limited to advocacy on behalf of the impacted voters, and contacting voters whose registrations BVMF believes were wrongfully

9

cancelled. The Secretary's wrongful withholding of the requested records impedes BVMF's ability to effectively protect the voting rights of the communities it serves and publicly advocate against improper voter purges.

## GENERAL ALLEGATIONS

### I. The National Voter Registration Act provides a private right of action to obtain records related to voter list maintenance activities.

28. The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. In enacting the NVRA, Congress expressly aimed to improve access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and by making it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2).

29. Congress also found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

30. To further those pro-voter purposes, the NVRA imposes strict restrictions on whether, when, and how a state may cancel a voter's registration. *See id.* § 20507(a)(3)–(4), (b)–(d).

31. A state may immediately cancel registration only in rare circumstances, such as when a registrant requests to be removed from the rolls or is convicted of a disenfranchising felony. *See id.* § 20507(a)(3)(A)–(B).

32. Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedures meant to protect qualified voters' access to the franchise and minimize the risk of erroneous cancellations. *See id*. § 20507(a)(3)(C), (c)–(d).

33. For instance, a state may not remove a registrant from the voter roll "on the ground that the registrant has changed residence" unless the resident either confirms the change in writing *or* fails to respond to a duly-transmitted notice *and* has not voted or appeared to vote "in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice." *Id*. § 20507(d)(1)(A)–(B).

34. The notice must include a "postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address[.]" *Id*. § 20507(d)(2). The NVRA also specifies certain information that must be provided on the notice. *Id*.

35. Additionally, states may not remove a registrant "by reason of the person's failure to vote." *Id*. § 20507(b)(2).

36. The NVRA also requires that any voter roll list maintenance program be "uniform" and "nondiscriminatory." *Id*. § 20507(b)(1).

37. The NVRA further requires states to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

38. This public inspection provision reflects Congress's determination that "disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012).

39. Accordingly, courts construe the NVRA's public inspection requirement broadly to ensure that the public can obtain access to records relevant to determining whether voters have been erroneously purged from a state's voter list. *See, e.g.*, *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1336 (N.D. Ga. 2016).

40. Finally, the NVRA provides a private right of action for private parties injured by a state election official's refusal to comply with its provisions, including the public inspection provision. Specifically, a person "aggrieved by a violation" of the NVRA may "provide written notice of the violation to the chief election official of the State involved," and "[i]f the violation is not corrected within 90 days after receipt of [the] notice," the "aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b)(1)–(2).

**II.   Secretary Raffensperger refuses to provide an adequate response to Plaintiffs' NVRA requests.**

41. On September 22, 2025, following reports of Secretary Raffensperger's purge of Georgia's voter rolls, Plaintiffs submitted a request for public records under the NVRA. *See* **Exhibit A.**

42. Generally, Plaintiffs requested records relating to the voters on the Purge List, including information about the content of the notices sent to those

12

voters, any responses by the voters, and the voters' recent voting and registration history, as well as records relating to the methodology the Secretary's office used to determine which voters to place on the Purge List. *Id*.

43. The Records Requested indisputably fell within the ambit of the NVRA's public inspection provision, which encompasses "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

44. On October 9, 2025, the Secretary's office responded to Plaintiffs' requests by sending two nearly identical emails. *See* **Exhibits B & C**. These emails included only one record, a spreadsheet listing four categories of information for voters on the Purge List: their county, voter ID number, "Inactive Status Reason," and current registration status (that is, whether the voter's registration had been cancelled).

45. "Inactive Status Reason[s]" listed on the spreadsheet were "NCOA," "Returned Mail," "No Contact," or "Cross State."

46. The spreadsheet provided no further information about how the Secretary determined whether a given voter fell into any of those categories.

47. The responses also pointed Plaintiffs to a spreadsheet available on the Secretary's website that provided the names and addresses of voters on the Purge List.

48. The Secretary's responses were deficient. The Secretary failed to produce records reflecting when each voter was sent initial and follow-up notices,

13

details regarding any responses (or lack thereof) to such notices, and the last election in which voters on the Purge List voted. *See* Ex. A at 3–4, Requests Nos. 1 & 2. The Secretary also failed to produce records reflecting the substance of the initial and follow-up notices sent to voters. *See id*. at 5, Request 3. And the Secretary failed to produce records reflecting the methodologies by which voters were placed on the Purge List. *See id*., Requests 4–7. In short, the Secretary simply refused to provide records responsive to the majority of Plaintiffs' requests.

49. Pursuant to 52 U.S.C. § 50210(b)(1), Plaintiffs sent a letter to the Secretary, dated October 24, 2025, providing notice that the Secretary's failure to make the full scope of the Records Requested available for inspection violated the public inspection provision of the NVRA. *See* **Exhibit D.** Plaintiffs asked the Secretary to supplement his response and produce the full scope of the Records Requested. *Id.*

50. The Secretary's office acknowledged receipt of the letter on October 27, 2025.

51. The Secretary did not produce any additional records, take any action to correct his violation of the NVRA, or substantively respond to this letter within the 90-day period provided by § 20510(b)(2), which expired on January 22, 2026.

## CLAIM

### Count I
### National Voter Registration Act
### 52 U.S.C. § 20507(i)(1); 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201–02

52.  Plaintiffs incorporate the preceding paragraphs of this Complaint as though fully set forth herein.

53.  The NVRA requires the Secretary to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

54.  Plaintiffs submitted a public records request pursuant to Section 20507(i)(1), seeking to inspect records related to Secretary Raffensperger's programs and activities that resulted in a purge of voters from Georgia's voter registration list.

55.  The Records Requested are required to be made available for public inspection under the NVRA.

56.  Secretary Raffensperger did not make available for public inspection the full scope of the Records Requested, in violation of the NVRA's public inspection provision.

57.  Plaintiffs alerted Secretary Raffensperger of this violation in their letter dated October 24, 2025.

58.  Secretary Raffensperger did not respond to Plaintiffs' letter or correct the violations of the NVRA within 90 days.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

i. Declare that Secretary Raffensperger's refusal to make available for public inspection the full scope of the Records Requested violates the National Voter Registration Act, 52 U.S.C. § 20507(i)(1).

ii. Issue an injunction requiring Secretary Raffensperger to make available for public inspection the full scope of the Records Requested as required by the National Voter Registration Act, 52 U.S.C. § 20507(i).

iii. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, under 42 U.S.C. § 1988, 52 US.C. § 20510(c), and any other applicable law.

iv. Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: February 27, 2026          Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks
Ga. Bar. No. 341578
**KREVOLIN & HORST, LLC**
1201 W. Peachtree St., NW
Suite 3500, One Atlantic Center
Atlanta, GA 30309
Tel: (404) 888-9700
Fax: (404) 888-9577
Email: sparks@khlawfirm.com

Uzoma N. Nkwonta*
Branden D. Lewiston*
Marcos Mocine-McQueen*
Max C. Accardi*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
unkwonta@elias.law
blewiston@elias.law
mmcqueen@elias.law
maccardi@elias.law
Tel: (202) 968-4652

*Counsel for Plaintiffs CWA Local 3204, CWA Local 3204 Retired Members Council, and Black Voters Matter Fund.*

*Pro Hac Vice applications forthcoming

17