UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DERON FURR, II | ) |
|     Plaintiff, | ) |
| | ) CIVIL ACTION NO. |
| v. | ) |
| | ) |
| NFL PLAYER DISABILITY & NEUROCOGNITIVE | ) Related Prior |
| BENEFIT PLAN, | ) Case No. |
| a/k/a Bert Bell/Pete Rozelle NFL Player Retirement Plan | ) 1:21-cv-01966-LMM |
| a welfare benefit plan, | ) |
| | ) |
|     Defendant, | ) |
| _____ | / |

## **COMPLAINT**

Plaintiff DERON FURR, II ("Plaintiff" and/or "Mr. Furr"), through his undersigned counsel, files this Complaint against Defendant NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN ("Defendant" and/or "the Plan"), and states as follows:

### **Jurisdiction and Venue**

1.    This is a civil action arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA").

2.    This Court has jurisdiction pursuant to 28 U.S.C. §1331 and specifically 29 U.S.C. §1132(e)(1).

3.    The ERISA statute provides a mechanism for administrative or internal appeal of benefit denials. In this case, those avenues have been actually or deemed

exhausted, and this matter is now properly before this Court for judicial review.

4.    Venue is proper in the United States District Court for the Northern District of Georgia, pursuant to 28 U.S.C. §1391 and specifically 29 U.S.C. §1132(e)(2), because an action may be brought in the district where the plan is administered, where the breach took place, or where the defendant resides or may be found. The breach took place and the Defendant can be found in the Northern District of Georgia.

### Nature of Action

5.    This action seeks an award of football Line-of-Duty Disability benefits to Plaintiff DeRon Furr pursuant to an employee welfare benefit plan ("the Plan"). Also it seeks Disability Benefits to Plaintiff Furr under the NFL Disability Plan and Equitable remedies based on Furr's entitlement to Social Security Disability. ERISA applies to this action because the Plan constitutes an employee welfare benefit plan as defined by 29 U.S.C. § 1002(1). Plaintiff's coverage under the Plan made him a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

### Parties

6. At all times relevant hereto, Plaintiff DeRon Furr has been a citizen and resident of the state of Georgia, and he is domiciled in Dekalb County. This is Mr. Furr's true, fixed, and permanent home and the place he intends to return to after any absence.

7. Mr. Furr is a former professional football player who played in the National

Football League ("NFL") from on or about May 22, 2014 to July 24, 2014 for the Kansas City Chiefs.

8.     At all times relevant hereto, Mr. Furr was a participant in the Plan as a benefit incident to playing in the NFL. The Plan constituted an "employee welfare benefit plan" as defined by U.S.C. § 1002(1) and Plaintiff DeRon Furr's, coverage under the Plan made him a "participant" in the Plan pursuant to U.S.C. § 1002(7).

9.     At all times relevant hereto, the NFL provided eligibility to receive <u>Line of Duty</u> Disability benefits to any of its active players or inactive vested players, including Plaintiff DeRon Furr through the Plan. Benefits were awarded to any active player or inactive vested player determined to be totally and permanently disabled under the definition of disability in the Plan.

10.     At all times relevant hereto, the NFL provided eligibility to receive <u>Disability benefits</u> to any of its eligible players who were determined disabled under the plan. Players who are determined disabled by the Social Security Administration are deemed disabled under the NFL Disability Plan.

11.     As a participant in the Plan (s), Mr. Furr is entitled to receive line of duty and/or disability benefits under the Plan(s) if he meets the definition of Disability and the other provisions for entitlement.

### **Statement of Facts**

12.     Mr. Furr signed with the Kansas City Chiefs on March 1, 2014, for his rookie

season. While he was at work, training with the Kansas City Chiefs training, he suffered orthopedic and neurological injuries.

13.     On July 22, 2014, Mr. Furr had symptoms of significant lower back pain with radiating pain into the right low extremity.

14.     During his NFL training and as the direct result of working in the NFL, Mr. Furr sustained impacts to his head, skeletal system, and joints.

15.     Prior to beginning his NFL career, Mr. Furr had no such issues.

16.     Mr. Furr's career ended before the implementation of more stringent NFL rules designed to protect players.

17.     Mr. Furr's career ended before he completed his first full season in the NFL.

18.     The Plan treated Mr. Furr as if he had two disability applications both based on orthopedic impairments: (1) February 16, 2016, received by the Plan on February 23, 2016 and (2) May 19, 2017, received by the Plan on June 5, 2017.

**19.     February 16, 2016, Application:** The application received by the Plan on February 23, 2016, was denied on March 8, 2016. On March 15, 2016, Mr. Furr appealed the initial determination. The Plan considered the appeal at its meeting on May 19, 2016, and issued a final decision denying the claim on appeal on May 24, 2016.  On March 31, 2016, there was a collective bargaining agreement retroactively amending the point system used to add points for additional impairments.  The Plan reconsidered the prior denial under the same administrative record on December 30,

4

2016, and denied the claim again on January 11, 2017. Mr. Furr had 180 days to appeal to July 10, 2017. Mr. Furr filed a time appeal.

20.    **May 19, 2017 Application:** The application received by the plan on June 5, 2017, was denied on July 20, 2017. Mr. Furr had 180 days to appeal and filed a timely appeal on October 9, 2017. The Plan reviewed the appeal and determined that Mr. Furr was "ineligible for LOD benefits under Plan Section 5.4(b) due to your failure to attend a required medical examination" because he did not provide at least two business days' advance notice to the NFL Player Benefits Office that he was unable to attend. The Plan sent a final denial letter on November 9, 2017. Having exhausted all administrative remedies, Mr. Furr was entitled to file an action under 502(a) of ERISA.

21.    At the time of his Application for Disability, as a direct result of injuries suffered while playing football for the NFL, Mr. Furr had sustained severe injuries including orthopedic injuries which under the point system and revised point system totaled more than 10 points.

22.    Defendant affirmed its decision to deny Mr. Furr's appeals despite being in possession of overwhelming evidence that Mr. Furr was and remained disabled under the terms of the Plan.

23.    Further Defendant engaged in routine practices that prevented Mr. Furr from submitting evidence in support of his claim and acted unreasonably, arbitrarily and

capriciously in the administering of the plan and consultative examinations for evaluating orthopedic impairments.

24.    Defendant failed to provide adequate notice prior to scheduled medical examination, and required Plaintiff Furr to submit medical evidence ten days prior to a scheduled examination, but then gave notice of less than ten days when scheduling such examinations, making it impossible for Plaintiff Furr to provide timely additional records in support of his claim or participate effectively in the process.

25.    Defendant acted unreasonably in cancelling an independent medical examination when Plaintiff Mr. Furr was present and ready to be examined.

26.    Defendant acted unreasonably when failing to give proper notice of an examination in refusing to reschedule such examinations.

27.    Defendant based its conclusion "primarily" on the incomplete, fundamentally flawed, contradictory, and unreliable reports of its' hired physicians, significantly misrepresenting the findings in said reports and ignoring the substantial and compelling evidence clearly evidencing Mr. Furr's disability under the Plan.

28.    As a result of a 2021 court action and confidential settlement agreement signed by the NFL attorney on September 30, 2021, Defendant agreed to remand of Furr's claim(s) to Defendant for further administrative process to reconsider the claims collectively *de novo* as a consideration of a "June 2017 application" pursuant

to the terms of the agreement and the Plan and pursuant to the very explicit terms in the settlement agreement. A copy of this Settlement Agreement will be filed with the Court under seal as **Exhibit A**.

29.    The Board was tasked with reconsidering all evidence through the present time to determine whether between July 2014 and July 25, 2018, based on terms of the Plan in effect on July 25, 2018 for Line of Duty benefits, Mr. Furr had the requisite number of points necessary to qualify for line of duty benefits based on his Orthopedic Impairments.

**30.**    A copy of the point system to be used was specified by the parties as APPENDIX A, VERSION 2 – Point System for Orthopedic Impairments. The Board was to give no weight to any prior determinations. A copy of the APPENDIX A, VERSION 2 Point System for Orthopedic Impairments is attached as **Exhibit B.**

31.    The Introduction in the document states:

> This Point System for Orthopedic Impairments ("Point System") is used to determine whether a Player has a "substantial disablement" within the meaning of Plan section 5.5(a)(4)(B). The Point System assigns points to each orthopedic impairment recognized under the Plan. **A Player is awarded the indicated number of points <u>for each occurrence of each listed orthopedic impairment</u>**, but only where the Player's orthopedic impairment arose out of League football activities, and the impairment has persisted or is expected to persist for at least 12 months from the date of its occurrence, excluding any reasonably possible recovery period.
>
> (emphasis added).

32.    During the remand process, Mr. Furr contended as a direct result of injuries

suffered while playing football for the NFL, he sustained severe injuries including orthopedic injuries which under the applicable revised point system totaled more than 10 points. In support of his claims Mr. Furr provided, at least three expert medical orthopedic opinions, from examining orthopedic surgeons, reviewing the evidence and explaining the calculation of at least 14 points for the conditions in existence as of July 25, 2018.

33.    In connection with the remand proceedings Mr. Furr presented evidence to the plan showing the following history:

(1) Deron Alton Furr II is a young male born in 1989 with a Bachelor of Arts in Organizational Leadership. He was a linebacker for the Kansas City Chiefs (2013–2014) and has had no sustained employment since his NFL work-related back injury;

(2) Mr. Furr's medically determinable impairments as of July 25, 2018, include chronic low back pain, post-laminectomy/failed back syndrome with multilevel degenerative disc disease at L4-L5 and L5-SI, and radiculopathy, adjacent-segment disease, status post multiple lumbar surgeries and fusion, episodic acute lumbar muscle spasms, and generalized musculoskeletal pain.

(3) His inability to return to work stems from a traumatic NFL back injury on 07/21/2014 requiring repeated surgical interventions, which precipitated a progressive degenerative process of the lumbosacral spine and chronic radiculopathy.

(4) Objective confirmation of his impairments is documented by MRI and CT imaging showing L4–L5 and L5–S1 herniations, canal stenosis, and intact fusion hardware; EMG/NCS studies confirming S1 radiculopathy; functional capacity evaluations well below sedentary demands; and elevated CK levels during muscle-injury episodes.

(5) Treatment has included three microdiscectomies (2014, 2017 x2), revision laminectomy, 360° L5–S1 anterior and posterior fusion (2019),

multiple epidural and facet injections, physical/occupational therapy, chiropractic care, NSAIDs, opioids, muscle relaxants, topical lidocaine, steroids, IV fluids and antiemetics in the ED, plus use of a cane and lumbosacral orthosis; inpatient surgical hospitalizations and frequent ED visits occurred between 2014 and July 2018 (which continue to present day).

(6) Treating surgeons and pain specialists have consistently opined Mr. Furr is permanently disabled from any gainful employment beyond a sedentary level, with severe functional limitations, significant off-task time and absences; a 2022 examiners concurred that his objective findings support total disability.

(7) Prior to his July 21, 2014 back injury, Mr. Furr underwent routine preseason athletic and orthopedic clearances reflecting no significant musculoskeletal or neurological deficits. On May 21, 2014, NFL team medical staff performed an administrative and physical examination revealing normal vital signs, full cervical and lumbar range of motion, and negative X-rays of the lumbar spine and knee. He had a history of ADHD and two prior concussions but reported no current cognitive or symptom sequelae.

(8) Orthopedic evaluation by Dr. Barnthouse and Kansas City Chiefs athletic trainers documented full knee range of motion, no effusion or laxity, and only mild hamstring tightness. A prior left knee meniscus injury and remote concussions were noted, but no restrictions were placed beyond standard Grade 2 clearance for play.

(9) During Organized Team Activities on July 21, 2014, Mr. Furr developed acute low back pain with right-sided radicular symptoms, prompting evaluation by the Chiefs- athletic training staff.

(10)    Physical examination showed tenderness over the lumbar paraspinal and sacroiliac regions, positive straight-leg raise on the right at mid-thigh, and no bowel or bladder involvement. Plain radiographs of the lumbar spine on July 14, 2014 were negative for fracture or alignment abnormalities, but an MRI on July 11 demonstrated moderate central and right paracentral disc bulge at L5-S1 with moderate to severe right lateral recess stenosis impinging the S1 nerve root, along with multilevel facet hypertrophy most pronounced at L4-L5 causing foraminal narrowing.

(11)    Conservative management included nonsteroidal anti-inflammatory drugs, muscle relaxants, physical therapy referral, and a right S1 transforaminal epidural steroid injection under fluoroscopic guidance on July 31, 2014.

(12)    The procedure was technically successful but provided only partial relief; follow-up on August 14, 2014 indicated approximately 25% symptom improvement, with persistent buttock and low back pain rated 6/10 and unchanged radicular signs.

(13)    Despite adherence to multidisciplinary therapy, his radicular symptoms remained refractory, and imaging review confirmed persistent right paracentral protrusion at L5-S1 with ongoing nerve root compression.

(14)    On August 29, 2014, Mr. Furr underwent a right L5-S1 microdiscectomy via right-sided laminotomy, during which two large free disc fragments were removed. Intraoperative blood loss was minimal (25 mL), and no complications were reported. He was discharged the same day on a regimen of cyclobenzaprine, acetaminophen-oxycodone, and ibuprofen with close outpatient follow-up. Six-week postoperative review revealed incision healing and significant pain reduction to 2/10, but residual mild discomfort persisted with maximal straight-leg raise and minimal functional gain.

(15)    Continued radicular pain and mechanical back symptoms led to a right L5-S1 revision microdiscectomy and right laminectomy on February 8, 2017.

(16)    Despite revision surgery, Mr. Furr-s symptoms recurred over the subsequent years, and diagnostic imaging on July 1, 2019 confirmed epidural fibrosis, prior hemilaminotomy changes, and facet arthropathy contributing to central canal and foraminal stenoses at L4-L5.

(17)    In response, Mr. Furr underwent a third surgery on August 8, 2019: a 360° L5-S1 fusion with anterior interbody graft and posterior pedicle screw instrumentation. Postoperative flexion-extension radiographs on August 14 showed intact hardware without instability.

(18)    Despite multiple operative and nonoperative interventions, serial imaging and electrodiagnostic studies have documented persistent pathology and neurologic compromise.

(19)    An MRI on January 29, 2015 revealed small recurrent right paracentral protrusion and epidural fibrosis at L5-S1.

(20)    A September 8, 2016 MRI confirmed severe bilateral L5-S1 foraminal stenosis and epidural fibrosis.

(21)    A March 2, 2018 MRI demonstrated stable post-laminotomy changes with adjacent-segment bulging at L4-L5 causing additional foraminal narrowing.

(22)    A July 28, 2020 MRI corroborated intact fusion hardware at L5-S1 but showed the L4-L5 protrusion with mild stenosis.

(23)    Nerve conduction studies on April 15, 2022 confirmed mild bilateral L5 radiculopathy correlating with his ongoing burning pain and paresthesias in the lower extremities.

(24)    Collectively, the objective record underscores recurrent neural compression, failed surgical outcomes, ongoing radiculopathy, and biomechanical instability that limit Mr. Furr-s functional capacity and arise from his injury in the NFL.

34.    Mr. Furr provided medical opinions addressing his medical conditions and the point systems which concluded that his orthopedic injuries / impairments exceeded 10 points.

35.    Mr. Furr provided medical opinions contradicting the NFL medical opinions and addressing why the NFL opinions were in error and explaining in detail how his medical conditions, as of July 25, 2018, exceeded the required 10 points.

36.    The NFL's medical evaluators failed to consider each occurrence of an orthopedic impairment and failed to consider the impairments as listed in the ratings system. For example, a faulty evaluation considered the impairments at L4-L5 and L5-S1 as one or failed to consider the L4-L5 herniation or failed to consider

radiculopathy. If more than one disc of the spine is impaired the rating should not be exactly the same as if a single disc is impaired. This means that if every single disc is impaired in the spine such a player would have the same rating for impairment as a player with only a single disc impairment. This rationale belies logic and a fair reading of the ratings.

37.    On November 17, 2021, Erik **Bendiks** MD and Quentin Jenkins PA-C, Georgia Spine and Orthopedics, treated and evaluated Mr. Furr for chronic low back pain and bilateral leg symptoms, despite multiple back surgeries, and these Orthopedic Specialists assigned **<u>14 NFL disability impairment points</u>**, and opined permanent disability from gainful employment.

38.    On July 23, 2022, Dr. P. Brent **Koprivica,** a Kansas City Orthopedist, performed an addendum to his evaluation for DeRon Furr, finding Mr. Furr's impairment was **<u>a minimum of 14 points</u>** and up to 24, exceeding the 10-point threshold for Line of Duty disability benefits. Dr. Koprivica noted Mr. Furr has chronic failed back syndrome with bilateral lumbar radiculopathy and adjacent segment disease from football-related injuries in 2014. The opinion explained to reasonable degree of medical certainty that Mr. Furr's failed back syndrome exceeds the 10-point threshold (total at least 14–24 points) and precludes competitive employment.

39.    Orthopedic Surgeon Ali **Nourbakhsh** who was treating Mr. Furr, rated Mr.

Furr's impairment under the NFL line of duty **14 points**. On February 9, 2022, Dr.

Ali Nourbakhsh wrote:

> An independent medical evaluation of DeRon Furr's entitlement to benefits under the NFL Player Line of Duty (DOL) point system was conducted by me between January 9-14, 2022. Mr. Furr was present in my clinic at WMG Orthopedic Surgery of Atlanta Medical Center Atlanta Medical on Feb, 2022, and he was interviewed as to his history and examined. Subsequently, I reviewed over 1700 pages of medical records including MRI/CTScan/Imaging reports of July 2014, July 2015, September 2016, March 2018, September 2018, July 2019, July 2020, and the EMG/NCS of September 2016, and the operative reports from three surgeries: August 29, 2014, February 8, 2017, and August 8, 2019. In addition, I reviewed and received MRI reports from (1) Elite Radiology which contained the September 2016 MRI and September 19, 2016 EMG of Dr. Chang, and the March 2, 2018 MRI and (2) Outpatient Imaging which contained the September 2018 MRI. The medical records contained a comprehensive narrative report from Koprivica, M.D., M.P.H, which outline Mr. Furr's treatment history and medical evaluations. This report appears to be an accurate summary and is deferred to in connection with my opinion. I was specifically asked to review the IME Opinion of Dr. Canizares of ALL Florida Orthopedic Associates dated January 18, 2022. This report similarly recognized the lengthy and comprehensive medical summary from Dr. Koprivica. I completed a physician report form – Orthopedics LOD Benefits dated February 14, 2022. <u>In doing so I had in my possession a complete copy of the **NFL Player Disability & Neurocognitive Benefit Plan including Article 5 Line of Duty Benefits and Appendix A, Version 2 Point System for Orthopedic Impairments**. Restricting my review to prior to July 2018, I rated Mr. Furr with 14 points prior based on all objective medical information documented in the records and my review of the MRI dated March 2, 2018. My review diverges from Dr. Canizares and is consistent with that of Dr. Koprivica, in that I awarded 5 points for the Lumbar Radiculopathy with MRI L4-5 Herniation Based on my review of the MRI imaging of March 2, 2018, it appears there is a herniation at L4-5 contributing to the radiculopathy that remained post-fusion surgery at L5-S1; thus the 5 points are also appropriated based on the documented herniation with radiculopathy at L4-5; as well as the documented lumbar radiculopathy.</u>

> I did not award points for the fusion surgery that occurred after July
> 2018.
> Ali Nourbakhsh

40.    On remand review, by letter dated August 31, 2022, the NFL Player Disability

Benefits Plan issued its final decision on review. A true and correct copy of this letter

is attached as **Exhibit C**.

41.    The Plan denied Plaintiff's claim despite the opinions from orthopedic

physicians Nourbakhsh, Koprivica and Bendiks all opining that the line of duty

injuries and impairments exceeded the necessary 10 points. The Plan rejected Mr.

Furr's arguments as to the failure of the NFL Plan doctors to properly consider Mr.

Furr's line of duty impairments in the rating determination. The NFL Plan doctors

failed to consider both the herniations at L4-5 and L5-S1 and the well documented

lumbar radiculopathy and surgery in total.

42.    The Plan's final decision letter informed Mr. Furr of his legal rights to bring

an action against the Plan stating:

> You should regard this letter as a final decision under the September 30, 2021
> confidential settlement agreement. To obtain further review of this decision, you
> have the right to bring an action under Section 502(a) of the Employee Retirement
> Income Security Act of 1974, as amended. Under Plan Section 13.4(a) you must file
> such an action within 42 months from the date of the Board's decision. Your deadline
> for bringing such an action therefore is February 28, 2026.

43.    Plaintiff disagrees with the determination of the Plan and brings this action

for review of the decision under 502(a) of ERISA.

44.    Plaintiff's action is timely filed.

45.    By its actions to date, Defendant has failed to apply the "higher-than-marketplace quality standards" imposed on ERISA fiduciaries according to *Metro.Life Ins.Co. v. Glenn,* 128 S.Ct. 2343 (2008). Instead, Defendant has acted as Mr. Furr's adversary. The Plan failed to provide Mr. Furr with a full and fair determination of the point system as demonstrated by the specialist who reviewed the impairments and the plan documentation and found Mr. Furr's impairments substantially exceeded the points necessary under the Plan.

46.    Defendant is acting under a conflict of interest and in violation of its fiduciary obligations.

47.    The file before the NFL Board was replete with evidence of the traumatic nature of Mr. Furr's impairments on his ability to work from the onset of the injury and continuing.

48.    On August 4, 2021, Lori Jetter of Southern Rehab and Sports Medicine conducted a comprehensive Functional Capacity Evaluation to address Post Laminectomy Syndrome, Radiculopathy Sl, Foraminal Stenosis Lumbar and Lumbar Disc Herniation.  Ms. Jetter opined as follows:

> Mr. Furr does not demonstrate the ability to perform sustained work activities over an 8-hr day at this time. Client does not demonstrate the ability to perform SUSTAINED lower extremity activities even at the sedentary level. Client does not demonstrate the ability to walk for any sustained periods, carry or stand for more than 1-2 hours total over an 8-hour day. Client is unable to tolerate/maintain the positions of stoop, crouch or kneel, stair climbing, balance, standing to perform handling right/left and prolonged standing to perform bimanual handling, at this

15

time.

1.  This client cannot walk one city block or more without rest or severe pain.
2.  This client cannot walk I block or more on rough or uneven ground.
3.  Client cannot climb steps without the use of a handrail at a reasonable pace without pain complaints.
4.  Client is unable to assume or maintain a crouched or kneeling position.
5.  Client requires an unscheduled break to recline or lie down frequently due to fatigue and pain complaints.
6.  Client can stand for 10-20 minutes before needing to sit down. Client can stand and walk for less than 2 hour in an 8-hour workday.
7.  While engaged in occasional standing and walking, the client requires the use of a back brace.
8.  This client would be off-task (unable to perform work and /or be away from the work environment due to limitations and pain in an 8 hour workday more than 30 % of the time.
9.  This client is likely to be unable to complete an 8 hour workday as a result of their physical limitations or pain at least 4 days per month.
10. Due to this client's impairments and associated limitations, they are unable to obtain and retain work in a competitive work environment, 8 hours a day, 5 days per week.

49.  A January 4, 2022, comprehensive vocational evaluation by Terry L. Cordray, MS CRC, Rehabilitation Expertise, LLC concluded Mr. Furr totally vocational disabled due to severe physical and secondary psychological limitations.

50.  Mr. Furr has been found DISABLED by the Social Security Administration under their rules for total disability.

51.  The NFL recognizes the Social Security Administration's determinations of disability in their own rules and regulations as determinative of total disability.

52.    Plaintiff Furr cannot work in any competitive work situation without significant accommodations due to injuries sustained in the NFL line of duty while employed as a Kansas City Chiefs Player.

53.    Despite extreme chronic pain and continued disability, Mr. Furr has tried to work with significant accommodations.

54.    Plaintiff Mr. Furr was never advised by the NFL or any other authority that until he completed a full first season, he would not be eligible for total disability benefits under the NFL disability plan. He was never told that if injured prior to completing his first full season he would only be potentially eligible for benefits under the 7 year limited, Line of Duty disability benefit. Mr. Furr was never advised by anyone from the NFL to seek private disability insurance or accident insurance or other gap coverage during his first season. Rather, Mr. Furr was assured that he was covered fully from his first day of practice in the event of any injury or disability by the NFL and its related entities.

## <u>COUNT I</u>
### <u>Action to Recover Plan Benefits, Enforce Rights Under the Plan & Clarify Entitlement to Plan Benefits Pursuant to 29 U.S.C. §1132 (a)(1)(B)</u>

55.    Plaintiff Mr. Furr hereby incorporates by reference all of the allegations contained in preceding paragraphs of this Complaint, as if specifically recited herein.

56.    Under the terms of the Plan, Defendant agreed to provide Mr. Furr with benefits in accordance with the terms and conditions set forth within the Plan.

57.    Defendant has failed and refused to pay Mr. Furr the Plan benefits from 2014 to the present.

58.    Mr. Furr has satisfied all conditions precedent under the Plan and is thus eligible to receive benefits, as he has not waived or otherwise relinquished his entitlement to said benefits.

59.    Defendant's failure to provide Mr. Furr with benefits from 2014, through present was and is contrary to, and in violation of the terms of the Plan and Mr. Furr's rights thereunder, and was and is contrary to clear, compelling and substantial medical evidence and other information that supports Mr. Furr's right to benefits under the Plan.

60.    Defendant suffers from an inherent conflict of interest because it pays Plan benefits from its own assets while also making the final determination as to whether to pay or deny claims for Plan benefits.

61.    Defendant's failure to provide Mr. Furr with benefits from 2014, through the maximum benefit period was influenced by its inherent conflict of interest.

62.    Defendant has failed to apply the provisions of the Plan consistently with respect to similarly situated Plan participants/claimants.

63.    Defendant has failed to afford Mr. Furr, a full and fair review, and subjected Mr. Furr to an unreasonable claims process according to 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503-1.

64.    The Plan benefits claim determination made by Defendant is arbitrary and capricious and in violation of ERISA.

65.    Mr. Furr is entitled to benefits under the Plan from 2014 for the maximum benefit period.

66.    Each monthly benefit owed to Mr. Furr, from 2014 is a liquidated sum and became liquidated on the date the payment was due and payable.

67.    Accordingly, Mr. Furr is entitled to recover pre-judgment interest on each such payment.

68.    As a direct result of Defendant's actions and inactions, Mr. Furr has incurred and will continue to incur significant costs and attorneys' fees until this matter is resolved.

69.    Accordingly, Mr. Furr is entitled to recover reasonable costs and attorneys' fees incurred, pursuant to ERISA, 29 U.S.C. § 1132(g)(1).

## <u>COUNT II</u>
### <u>Equitable Relief Action to Recover the Equivalent of Full Disability Benefits</u>

70.    Mr. Furr has been found disabled by the Social Security Administrative since the onset of his NFL injuries.

71.    Mr. Furr was precluded from receiving disability benefits under the NFL Plan based on a provision requiring he complete a full season with the NFL, prior to eligibility under the Plan.

72.    Mr. Furr seeks equitable relief and entitlement to full disability under the NFL

Plan as he is determined disabled by the Social Security Administration due to his Player related injuries.

73.    Mr. Furr seeks relief from the plan provision requiring he complete a full season prior to eligibility under the disability plan.

74.    When joining the NFL, Mr. Furr was told he was covered for full NFL player disability benefits.

75.    When joining the NFL, Mr. Furr was never informed that he was not covered and not eligible until completing his first full season of employment.

76.    When joining the NFL, Mr. Furr was never informed by the NFL or the management of his Kansas City Chiefs team that he needed to seek private disability coverage during any gap period.

77.    As a result of these failures to properly inform Mr. Furr, Mr. Furr has been harmed and seeks the equivalent of the disability benefits under the NFL disability plan and reasonable costs and attorneys' fees incurred in pursuing his claims.

## **PRAYER FOR RELIEF**

**WHERFORE**, Plaintiff Mr. Furr prays that this Honorable Court grant him the following relief:

1)    A declaratory judgment herein declaring:
   a.  Plaintiff Mr. Furr is Disabled pursuant to the language and within the meaning of the Plan(s);
   b.  Plaintiff Mr. Furr shall be afforded the return of, or alternatively the

financial relief from, any other employee plan benefits Plaintiff Mr. Furr was promised he would receive while also qualifying as Disabled under the Plan(s), which he lost or was forced to bear the cost(s) of as a result of Defendant's the Plan's wrongful denial of benefits;

c.  Plaintiff Mr. Furr shall be entitled to recoup all interest, costs, attorney's fees pursuant to 29 U.S.C. §1132(g)(1) or any other remedies;

d.  Plaintiff Mr. Furr may return to this Court, upon motion, to seek further declaratory relief in the event that it becomes necessary;

2)  A judgment against Defendant the Plan(s), for all benefits due to Plaintiff Mr. Furr under the terms of the Plan(s) due and owing since the denial of benefits or denial of eligibility to apply, plus any interest thereon;

3)  An award to Plaintiff Mr. Furr of his reasonable attorney's fees, costs and expenses of this action pursuant to 29 U.S.C. §1132(g)(1) and any other applicable law; and

4)  Such other and further relief at law or in equity this Court deems proper and just.

Respectfully submitted, this 27th day of February 2026.

/s/*Pamela I. Atkins*
PAMELA I. ATKINS
GA Bar No. 026302
Attorney for Plaintiff

Atkins & Associates, Attorneys-at-Law, LLC
6075 Barfield Road, Atlanta, GA 30328
Phone:(770)399-999 Fax:(770)399-9939
E-mail: patkins@adisability.com