# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| BRIAN KAISERMAN, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>KALSHI INC., KALSHIEX LLC, KALSHI KLEAR INC., KALSHI KLEAR LLC, TAREK MANSOUR, LUANA LOPES LARA, and JOSHUA BEARDSLEY<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

1. Plaintiff Brian Kaiserman, by and through the undersigned counsel, brings this action against Kalshi Inc., KalshiEX LLC (the "DCM Defendant"), Kalshi Klear Inc., Kalshi Klear LLC (the "DCO Defendant") (together, the "Kalshi Defendants"), and the Kalshi Defendants' Chief Executive Officer ("CEO") Tarek Mansour, Chief Operating Officer ("CCO") Luana Lopes Lara, and Chief Compliance Officer ("CCO") Joshua Beardsley (together, "Executive Officer Defendants") for violations of the Commodities Exchange Act ("CEA") and regulations promulgated by the Commodity Futures Trading Commission ("CFTC") pursuant to the CEA.

2. The Kalshi Defendants own and operate an online platform accessible at its website and mobile app (the "Kalshi Platform") that offers "event contracts"

1

where participants who are 18 years or older, including Plaintiff and Class members, can bet or "trade" on "event contracts" that are based on the outcome of sporting events or the performance of players in those sporting events (together, the "Sporting Event Contracts").

3.      The CEA and CFTC regulations prohibit the Sporting Event Contracts because they involve, relate to, or reference "gaming." Specifically, CFTC Rule 40.11 states:

> A registered entity shall not list for trading or accept for clearing . . . [a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references . . . gaming ….

4.      The Kalshi Defendants listed and cleared these Sporting Event Contracts in bad faith with full knowledge of these illegalities. Prior to improperly listing and clearing Sporting Event Contracts, the Kalshi Defendants admitted Sporting Event Contracts have "no inherent economic significance:" "[Y]ou can see it in the congressional record, and they give three examples of gaming contracts: Football, horseracing, golf. They're all games. It's something that has no inherent economic significance. It's something done for amusement. It may be done purely to facilitate the betting itself for its own sake."[1]

---

[1] Motion for Summary Judgment Hearing Tr. 15:4-11. KalshiEX LLC v. Commodity Futures Trading Comm'n, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025)

5.    And the Kalshi Defendants admitted that Sporting Event Contracts cannot be listed or cleared because they relate to "gaming:" "The 'gaming' category reaches contracts contingent on games—for example, …whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder sports gambling through the derivatives markets."[2]

6.    But, beginning January 2025, the Kalshi Defendants listed and cleared the Sporting Event Contracts anyway, including event contracts related to "whether a certain team will win the Super Bowl." After *repeatedly* recognizing this legal line in the sand (*see* Section IV(J)), the Kalshi Defendants got greedy and crossed it in bad faith.

7.    By September 2025, 90% of the Kalshi Defendants' revenue was concentrated in illegally listed and cleared Sporting Event Contracts; and by February 2026, the Kalshi Platform traded $1 billion related to the Super Bowl.

8.    The Kalshi Defendants engaged in this conduct across all fifty states, including Georgia, evading the exact CFTC regulations it once acknowledged prevented the Sporting Event Contracts it offers today.

9.    Moreover, the Kalshi Defendants aggressively marketed their Sporting Event Contracts to college students and people under the age of 21 – the legal age

---

[2]Plaintiff's Memorandum of Law in Support of Motion For Summary Judgment at 16. KalshiEX LLC v. Commodity Futures Trading Comm'n, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024)

in the vast majority of states where sports gambling is permitted.

10. The CEA provides a private right action against Designated Contract Markets, Derivative Clearing Organizations, and their executive officers for violating or failing to enforce rules, regulations, bylaws, and resolutions that the CEA requires to be enforced, including Rule 40.11. In other words, the CEA gives a private right of action for listing and clearing the Sporting Event Contracts at issue in this case.

11. The Kalshi Defendants and their executive officers have committed multiple violations of the CEA by offering Sporting Event Contracts as detailed below.

12. These violations have damaged Plaintiff and the putative Class Members by causing them to lose money on Sporting Event Contracts that only existed because the Kalshi Defendants chose to violate their statutory and regulatory obligations.

13. As the DCM, KalshiEX LLC created the prohibited Sporting Event Contracts, established their terms and conditions, and made them available for trading thereby implementing and enforcing exchange rules that violated CFTC Rule 40.11 and the CEA, as alleged in Count I.

14. As the DCO, Kalshi Klear LLC accepted for clearing, cleared, novated, guaranteed, and settled prohibited Sporting Event Contracts, enforced

clearing and settlement rules that implemented unlawful gaming contracts, and failed to enforce its own compliance rules, as alleged in Count II, and failed to promulgate required contract-eligibility rules that would have prevented the clearing of gaming-based contracts, as alleged in Count III.

15. The Executive Officer Defendants knowingly directed, approved, enabled, and oversaw the design, listing, clearing, compliance, and continued operation of prohibited Sporting Event Contracts, thereby willfully aiding, abetting, and inducing KalshiEX LLC's and Kalshi Klear LLC's violations of the CEA, as alleged in Count IV.

16. Kalshi Inc. exercised control, directed, and was actively involved in a joint enterprise that resulted in the creation, listing, clearing, enforcement, and monetization of prohibited Sporting Event Contracts through its subsidiaries, and, to the extent those subsidiaries were inadequately capitalized or operated merely as extensions of Kalshi Inc., dominated and controlled KalshiEX LLC and Kalshi Klear LLC such that corporate separateness was disregarded, as alleged in Counts V and VII.

17. Kalshi Klear Inc. controlled and oversaw the clearing infrastructure and governance that enabled Kalshi Klear LLC to accept, clear, novate, and settle prohibited Sporting Event Contracts, knowingly facilitated and profited from those clearing-based violations, and, to the extent Kalshi Klear LLC functioned as a mere

instrumentality, dominated and controlled Kalshi Kelar LLC such that corporate separateness was disregarded, as alleged in Counts VI and VIII.

18.     The Kalshi Defendants and the Executive Officer Defendants profited massively from these Sporting Event Contracts through revenues generated by and fees associated with trading, clearing, and platform activity, to the detriment of Plaintiff and putative Class Members, who incurred losses on the Sporting Event Contracts that would not have existed but for Defendants' uniform, nationwide conduct in listing and clearing contracts based on gaming.

## I.     JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the CEA, 7 U.S.C. § 1 *et seq*.

20.     This Court also has subject-matter jurisdiction pursuant to 7 U.S.C. § 25(c), which provides the district courts of the United States with jurisdiction over any private rights of action arising under the CEA.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions or violations by each of the Defendants giving rise to the claims occurred in this District, including Plaintiff and other Class members trading the Sporting Event Contracts, which were offered, listed, cleared, and paid to Plaintiff and other Class members in this District.

22.   Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because each of the Defendants are subject to personal jurisdiction in this District and therefore are deemed to reside here for purposes of venue.

23.   This Court has personal jurisdiction over each of the Defendants because each has purposefully directed activities throughout the United States and, specifically, toward residents of this District, by operating a highly interactive website and creating, listing, offering, trading, and clearing Sporting Event Contracts through the Kalshi Platform.

24.   Kalshi Inc. controls and operates the Kalshi Platform and website through which those contracts are made available to users nationwide, including in this District, and thus intentionally availed itself of the privilege of conducting business here.

25.   KalshiEX LLC, the Designated Contracts Markert or DCM, has purposefully directed its activities toward the United States as a whole and toward residents of this District by creating, listing, offering, and facilitating the trading of Sporting Event Contracts through the Kalshi Platform. KalshiEX LLC operates the exchange on which those contracts are made available to users nationwide, including users in this District, and its forum-directed conduct gives rise directly to the claims asserted in this action.

26.   This Court likewise has personal jurisdiction over Kalshi Klear LLC,

the Designated Clearing Organization or DCO, because, through its role in clearing Sporting Event Contracts, it has purposefully directed activities toward the United States and toward residents of this District. Kalshi Klear LLC clears and novates Sporting Event Contracts traded on the Kalshi Platform, holds collateral, and facilitates settlement of those contracts, thereby directly participating in and enabling each transaction entered into by users in this District. These forum-directed clearing and novation activities give rise to the claims asserted here.

27.    Kalshi Klear Inc., as the parent and owner of Kalshi Klear LLC, has purposefully directed activities toward the United States and toward residents of this District by enabling and controlling the clearing infrastructure through which Sporting Event Contracts traded on the Kalshi Platform are consummated.

28.    Kalshi Klear Inc. owns and controls Kalshi Klear LLC, the registered DCO that clears and novates each Sporting Event Contract entered into by users in this District, and it derives direct benefits from those forum-directed activities. The claims asserted arise out of and relate to the clearing and settlement of contracts conducted through its wholly owned subsidiary.

29.    This Court has personal jurisdiction over Tarek Mansour, the co-founder and CEO of the Kalshi Defendants, because he personally directs, controls, and participates in the forum-directed conduct giving rise to Plaintiff's claims.

30.     As CEO, Defendant Mansour exercises ultimate authority over the Kalshi Platform, including the creation, listing, marketing, and operation of Sporting Event Contracts offered to users nationwide, including users in this District. Mansour has repeatedly and publicly held himself out as responsible for Kalshi's regulatory posture, contract design, and platform operations, and he regularly speaks and acts on behalf of Kalshi Inc. and all Defendants in connection with those activities.

31.     On information and belief, Defendant Mansour also serves as a member of the boards of directors of the DCM and DCO Defendants and Defendant Kalshi Klear Inc. or otherwise exercises equivalent board-level authority over those entities. The DCM and DCO Defendants and Defendant Kalshi Klear Inc. are wholly owned within the Kalshi corporate structure. The exchange and clearing entities operate pursuant to CFTC-approved or-permitted rulebooks that require board oversight and expressly contemplate governance by affiliated persons.

32.     As CEO of the Kalshi Defendants and principal architect of the Kalshi Platform, Defendant Mansour necessarily participates in board-level governance of the exchange and clearing entities that carry out the core functions of listing, trading, clearing, novation, and settlement of the contracts at issue. Through this integrated governance role, Defendant Mansour purposefully availed himself of the privilege of conducting business in this forum, and Plaintiff's claims arise directly

9

from his forum-directed conduct.

33. This Court also has personal jurisdiction over Luana Lopes Lara, the co-founder and COO of the Kalshi Defendants, because she personally directs and manages the operational and product functions of the Kalshi Platform that are intentionally directed toward users in this District. As COO, Defendant Lopes Lara oversees day-to-day operations and platform functionality, including event contracts traded, cleared, and settled through the DCM and DCO Defendants.

34. On information and belief, Defendant Lopes Lara serves as a member of the boards of directors of the DCM and DCO Defendants and Defendant Kalshi Klear Inc. or otherwise exercises equivalent board-level authority over those entities. The exchange and clearing entities operate pursuant to CFTC-approved or -permitted rulebooks that require board oversight and expressly contemplate governance by affiliated persons.

35. As COO of the Kalshi Defendants and a co-founder of the Kalshi enterprise, Defendant Lopes Lara exercises operational control and strategic decision-making authority that necessarily extends to the exchange and clearing subsidiaries responsible for executing and guaranteeing the very contracts at issue. Her board-level participation and operational control form part of a single, integrated course of conduct purposefully directed toward this forum, giving rise to Plaintiff's claims.

36.    This Court has personal jurisdiction over Joshua Beardsley, the CCO of KalshiEX LLC and Kalshi Klear LLC because, as the CCO, he personally oversees and implements the compliance and regulatory framework governing Sporting Event Contracts offered to users in this District. On information and belief, Defendant Beardsley serves on, or exercises equivalent authority through, the boards or regulatory oversight bodies of the DCM and DCO Defendants, which are required by CFTC regulations and rulebooks to maintain board-level compliance oversight. Through this board-level and enterprise-wide compliance role, Defendant Beardsley purposefully directed forum-related conduct giving rise to Plaintiff's claims.

37.    Taken together, the Kalshi Defendants, including its CEO, COO, and CCO, operate as a single, integrated platform through which Sporting Event Contracts are created, offered, traded, cleared, novated, and settled for users nationwide, including users in this District, all for their common benefit.

38.    Because the Kalshi Defendants and the Executive Officer Defendants operate as an integrated enterprise and jointly participate in the conduct giving rise to Plaintiff's claims, all for a common and exclusive benefit, the exercise of personal jurisdiction over each of the Kalshi Defendants in this District comports with due process and traditional notions of fair play and substantial justice.

39.    This unified presentation is not merely cosmetic. The Kalshi Defendants' own privacy policy expressly states that it applies to KalshiEX LLC and its "parent, subsidiaries and affiliates," confirming that the Kalshi Defendants collectively collect, share, and use consumer data across the corporate family.

40.    The policy explains that the Kashi Defendants use personal information—including location data, device identifiers, and user activity—to "tailor . . . product offerings" and provide each Georgia resident a more "personalized and enhanced user experience."[3]

41.    These tools are also used to evaluate and refine Kalshi's marketing efforts within Georgia to provide "advertisements based on your interests and activities on [Kalshi.]"[4]

42.    Every aspect of this system is designed to reach into Georgia, identify Georgia residents, and encourage them to participate in Sporting Event Contracts on the Kalshi Platform.

43.    By expressly adopting enterprise-wide data collection and advertising practices, the Kalshi Defendants confirm that marketing and user targeting are coordinated activities undertaken for the benefit of all Kalshi Defendants.

---

[3] https://kalshi.com/docs/kalshi-privacy-policy.html (last visited March 12, 2026).
[4] *Id*.

44.    The Kalshi Defendants cannot simultaneously present themselves to consumers as a single Kalshi enterprise, share user data and advertising infrastructure across subsidiaries, and then disaggregate those same activities to evade personal jurisdiction.

45.    The personal data collected from Georgia residents is used to identify those residents, target them with geo-specific advertising, customize their experience on the Kalshi Platform, and encourage continued participation in Sporting Event Contracts.

46.    For example, the Kalshi Defendants have contracted with Meta to deliver targeted advertisements directly to Georgia citizens, explicitly encouraging them to open accounts and participate in Sporting Event Contracts on the Kalshi Platform.



**Kalshi - Trade the Headlines**
Sponsored

Library ID: 1480388519568616

Kalshi is the first federally regulated exchange where you can legally bet on the NFL in all 50 states.



47.    The Kalshi Defendants further promote the Kalshi Platform and the Sporting Event Contracts as "legal in all 50 states," a representation specifically designed to induce participation by residents of states, including Georgia, where

14

traditional sports betting is restricted.



 

15

48.    These advertisements are further reinforced by banner ads, search-engine optimization efforts, and direct email outreach, all designed to increase engagement and wagering activity by Georgia residents.

49.    Once Georgia residents create accounts, the Kalshi Defendants maintain direct and ongoing contact with them, encouraging them to continue to wager on Sporting Event Contracts on the Kalshi Platform through additional advertising and direct email communications.

50.    The Kalshi Defendants communicate with Georgia users to answer questions, provide recommendations, deliver newsletters, and promote continued participation.

51.    Critically, the Kalshi Defendants also directly contact Georgia users to collect money owed on the Kalshi Platform, thereby initiating financial contact within the State.[5] This active debt-collection conduct mirrors that of a traditional bookmaker pursuing bettors to settle accounts and underscores that the Kalshi Defendants' roles are neither passive nor neutral.

52.    Throughout the relevant time period, each of the Kalshi Defendants has consistently and deliberately conducted business in Georgia.

53.    Georgia users constitute a significant and valuable segment of Kalshi's customer base.

---

[5] *Id.*

16

54.    This is evidenced by the fact that, through the Kalshi Platform, the Kalshi Defendants also advertise and offer event contracts based on Georgia collegiate and professional sporting events, demonstrating their intent to exploit the Georgia market and profit from Georgia-based consumer interest.



55.    Through these actions, the Kalshi Defendants expressly seek to form contractual relationships with Georgia residents, including Plaintiff, and to transact Sporting Event Contracts business with them for the Kalshi Defendants' financial benefit.

56.     By doing so, each of the Kalshi Defendants has purposefully availed themselves of the privilege of conducting business in Georgia and cannot plausibly characterize their conduct as passive or incidental.

57.     These facts demonstrate that each of the Kalshi Defendants' contacts with Georgia is not isolated or accidental, nor are they attributable to a single entity acting alone.

58.     It was both foreseeable and intended that Georgia residents would use the Kalshi Platform. Indeed, it was the intended result of the Kalshi Defendants' extensive efforts to induce Georgia residents, specifically, to participate in Sporting Event Contracts on the Kalshi Platform. Each of the Defendants knew that their extensive efforts were successful and that Georgia users regularly participated in Sporting Event Contracts through the Kalshi Platform and knowingly profited from that participation.

59.     In short, Defendants collectively operated a highly interactive website and affirmatively reached into Georgia, advertised extensively in Georgia, solicited Georgia residents, formed contracts with Georgia residents, accepted payments from Georgia financial accounts, and profited from Sporting Event Contract transactions conducted by Georgia users.

60.     In fact, it was Defendants' pervasive contacts with Georgia through which Plaintiff – and other Class members – learned about Kalshi.

18

## II.    THE PARTIES

61.    **Plaintiff Brian Kaiserman** is a Georgia citizen and resident of Roswell, Georgia. Plaintiff created a Kalshi account in Georgia using his Georgia address and bank account. Plaintiff has lost money or other things of value by wagering on Sporting Event Contracts made available on the Kalshi Platform in Georgia.

62.    **Defendant Kalshi Inc.** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. It is the parent company, owning 100% of all other Kalshi Defendants - Defendant KalshiEX LLC, Defendant Kalshi Klear Inc., and Defendant Kalshi Klear LLC. In coordination with the other Defendants, it operates the Kalshi Platform, the prediction market, and the related clearing organization, through which United States residents can place wagers on the outcomes of sporting events.

63.    **Defendant KalshiEX LLC** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. It is a wholly owned subsidiary of Kalshi Inc. that operates a commodities exchange and prediction market whereby United States residents can place illegal wagers on the outcomes of sporting events. KalshiEX LLC is a "Designated Contract Markets" ("DCM") as that term is used in the CEA.

64.    **Defendant Kalshi Klear Inc.** is a Delaware corporation

19

headquartered at 594 Broadway Rm 407, New York City, New York 10012. It is a wholly owned subsidiary of Kalshi Inc and the parent company of Defendant Kalshi Klear LLC. In coordination with the other Defendants, it operates the Kalshi Platform (the prediction market, and the related clearing organization), through which United States residents can place wagers on the outcomes of sporting events.

65.   **Defendant Kalshi Klear LLC** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. It is a wholly owned subsidiary of Kalshi Inc. that operates a registered derivatives clearing organization and prediction market whereby United States residents can place illegal wagers on the outcomes of sporting events. Kalshi Klear LLC is a "Derivatives Clearing Organization" ("DCO") as that term is used in the CEA.

66.   **Defendant Tarek Mansour** is the co-founder and CEO of Defendant Kalshi, Inc. At all relevant times, Defendant Mansour exercised ultimate authority over the Kalshi Platform, including the design, approval, marketing, and operation of the Sporting Event Contracts offered nationwide. He has publicly held himself out as responsible for the Kalshi Defendants' regulatory posture and platform operations. On information and belief, Defendant Mansour serves on the boards as CEO of each of the other Kalshi Defendants or otherwise exercises equivalent board-level authority over those entities. Through this integrated governance role, Defendant Mansour participates in and oversees the exchange and clearing

20

functions central to the conduct at issue.

67.   **Defendant Luana Lopes Lara** is the co-founder and COO of Defendant Kalshi, Inc. In that role, she directs and manages the day-to-day operations and product functions of the Kalshi Platform, including oversight of the Sporting Event contracts traded, cleared, and settled through the DCM and DCO Defendants. On information and belief, Defendant Lopes Lara serves on the board as COO of each of the other Kalshi Defendants or otherwise exercises equivalent authority. Her operational control and board-level participation extend across the exchange and clearing subsidiaries responsible for executing the contracts at issue.

68.   **Defendant Joshua Beardsley** is the CCO of both Defendants KalshiEX LLC and Kalshi Klear LLC. In those interrelated roles, Mr. Beardsley is the Kalshi Defendants' designated corporate representative responsible for ensuring compliance with the CEA and CFTC regulations and the rulebooks of Defendants KalshiEX LLC and Kalshi Klear LLC. This responsibility includes the establishment, administration, and enforcement of compliance policies governing listed and cleared event contracts.

## III.   The Kalshi Predictions Market and How it Works

69.   A "prediction market" allows for the purchase and sale of "event contracts," which are binary contracts that pay $1 if an event occurs and $0 if an

event does not occur (or vice versa). In short, an event contract pays out if a future event does (or does not) occur.

70. The terms "prediction market" and "event contract" are colloquialisms. Prediction markets are designated contract markets and their affiliated derivatives clearing organizations that are registered with the CFTC. *See* 7 U.S.C. §§ 7; 7a-1. Event contracts are "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i).

71. The Kalshi Defendants own and operate the Kalshi Platform, a private technology company founded in 2018 by Defendants Tarek Mansour and Luana Lopes Lara. The Kalshi Platform is accessible as both a website and mobile application. The Kalshi Platform consists of the DCM Defendant, KalshiEX LLC; the DCO Defendant, Kalshi Klear LLC; and their parents, affiliates, and executives.

72. When the Kalshi Platform began offering markets in June 2021, the DCM Defendant offered binary yes-or-no contracts about whether an event would occur, such as "will a recession start by the second quarter of 2022" or "will income taxes on the highest income bracket increase by the end of 2021."[6] Customers could

---

[6] *See* Jesse Pound, "This new exchange lets investors vote yes or no on major events to hedge their portfolios," CNBC (Dec. 29, 2021),

buy either "Yes" or "No" at some variable price ranging from $0.01 to $0.99. The DCO Defendant cleared these contracts.

73.    At that time, the Kalshi Defendants did not list or clear Sporting Event Contracts and distinguished the event contracts listed at that time on the Kalshi Platform from gaming operations like casinos by arguing "the economic usefulness of hedging outcomes and market pricing are two elements that make Kalshi different from a casino."[7]

74.    In 2024, the Kalshi Platform started offering political election contracts, allowing consumers to bet on which candidate would win the 2024 presidential election or which party would control Congress.[8]

75.    Again, the Kalshi Defendants distinguished these event contracts from gaming, noting "Congress did not want sports betting to be conducted on derivatives markets." *KalshiEX LLC v. Commodity Futures Trading Commission*, 23-cv-03257, 2024 WL 4802698, *41 (D.D.C. 2024).

76.    Election betting drew significantly more consumers to Kalshi. In October 2024, consumers bet more than $100 million on Kalshi's election markets.

---

https://www.cnbc.com/2021/12/29/this-new-exchange-lets-investors-vote-yes-or-no-on-major-events-to-hedge-their-portfolios.html.

[7] *Id.*

[8] *See* Tarek Mansour, "It's official: You can now trade on the U.S. Presidential Election," Kalshi (Oct. 4, 2024), https://news.kalshi.com/p/official-kalshi-makes-history-with-100-legal-election-trading.

77.    In January 2025, despite the Kalshi Defendants' *repeated* prior admissions that gaming contracts should not be listed or cleared, the Kalshi Platform began to offer Sporting Events Contracts. Mansour posted, "Today, on the heels of our explosive growth, Kalshi takes its next big step: Sports. Legal sports markets, accessible to Americans in all 50 states."





78.    Kalshi's official account also posted statements touting that there would be "sports trading" in all 50 states and promoting its products as having "no house," and offering "[l]ive trading during the game[.]"



79.    Moreover, the Sporting Events Contracts were available to people as young as eighteen years, even though most states require a minimum age of twenty-one to wager on the outcome of sporting events.

80.    The decision to cross the line with Sporting Event Contracts proved to be highly profitable. By May 2025, more than 75% of Kalshi's volume came from sports betting, and public reports indicated Kalshi made a larger percentage of its money from sports than established licensed sports betting companies.[9]

---

[9] *See* Daniel O'Boyle, *Kalshi More Reliant On Sports Than DraftKings Or FanDuel, Data Shows*, InGame (Updated May 21, 2025),

81.     By September 2025, Kalshi had further expanded into sports gaming, introducing categories that mirror traditional sports betting. These offerings included bets tied to point spreads, overs/unders, player proposition bets (such as bets on the first player to score a touchdown), and, most recently, same-game parlays.

82.     Kalshi has now become primarily a sports-betting site. By September 2025, 90% of Kalshi's volume (approximately $2 billion) was from Sporting Events Contracts. A graphic from the New York Times illustrates that the vast majority of bets on the Kalshi Platform now involve, relate to or reference a classic example of gaming – sports:



https://www.ingame.com/kalshi-sports-data-trading-volume/.

83.    In February 2026, the Kakshi Defendants announced that trading volume for the 2026 Super Bowl surpassed $1 billion.[10]

## IV.    The Commodity Exchange Act Regulatory Framework

### A.    **Overview of the Commodity Exchange Act**

84.    The CEA, 7 U.S.C. § 1 *et seq.,* is a comprehensive federal statute governing U.S. derivatives markets.

85.    Congress enacted the CEA to regulate derivatives markets that serve legitimate economic purposes, such as hedging and price discovery. Through regulation, the CEA protects traders and the public from fraud, manipulation, excessive speculation, and gambling-like activity.

86.    To achieve these goals, the CEA establishes a tightly regulated market structure overseen by the CFTC.

87.    Rather than regulating every transaction directly, the CEA relies on a system of "registered entities,"[11] including DCMs and DCOs, that are granted authority to operate derivatives markets and clearing organizations only if they comply with detailed statutory duties, ongoing regulatory obligations and their own rules, bylaws, and resolutions.

88.    These registered entities serve as the first line of enforcement for the

---

[10] "Kalshi says Super Bowl trading volume surpassed $1 billion" CBS News, February 10, 2026. https://www.cnbc.com/2026/02/10/kalshi-super-bowl.html

[11] *See* 7 USC 1a(40) (defining the term "registered entity")

CEA and are required to police their own markets in good faith.

**B.    Designated Contract Markets**

89.    A Designated Contract Market, or DCM, is a registered derivatives exchange.

90.    DCMs are the CEA's equivalent of a stock exchange, but for futures, options, swaps, event contracts, and other derivatives rather than equities.

91.    Under the CEA, a DCM is responsible for:

a.    Listing contracts for trading;

b.    Establishing the terms and conditions governing those contracts;

c.    Monitoring trading activity;

d.    Enforcing compliance with the CEA, CFTC regulations and its own rules, bylaws, and resolutions; and

e.    Preventing the listing or trading of contracts that are prohibited by law, including by the CEA, CFTC regulations and its own rules, bylaws, and resolutions.

92.    When a DCM lists a contract, it affirmatively creates a regulated market for that contract and is legally responsible for ensuring that the contract's terms comply with federal law.

93.    The CEA expressly requires DCMs to "establish, monitor, and enforce compliance with the rules of the contract market," including the rules governing the

contracts they list.

94.     This responsibility includes ensuring that the contracts a DCM lists and administers comply with applicable CFTC regulations governing event contracts, including the CEA's and Rule 40.11's limitations on contracts that may be listed for trading.

95.     KalshiEX LLC, the DCM Defendant, is responsible for operating the part of the Kalshi Platform on which the event contracts are listed and traded. This includes determining whether each event contract may be legally listed, establishing the terms and conditions of each event contract, making those contracts available for trading on its platform, enforcing the term of the contracts offered, monitoring trading activity, and administering the resolution of contracts when the specified event occurs.

### C.     **Derivatives Clearing Organizations**

96.     A Derivatives Clearing Organization, or DCO, serves as clearinghouse for one or more DCMs.

97.     A DCO plays an active role in the functioning of event contracts, not merely acting as a passive payment processor. When a DCO accepts a contract for clearing, it takes steps to ensure the contract can operate as a legitimate market instrument.

98.     Under the CEA, DCOs are responsible for:

a.      Accepting or rejecting contracts for clearing;

b.      Managing financial risk associated with trades;

c.      Ensuring that only lawful and eligible contracts are cleared; and

d.      Enforcing compliance with CEA requirements applicable to clearing activity.

99.    Critically, when a DCO accepts a trade for clearing, it performs novation, whereby the original contract between the buyer and seller is extinguished and replaced with two new contracts: one between the DCO and the buyer, and another between the DCO and the seller.

100.    Through novation, the DCO becomes the central counterparty to both sides of the transaction and assumes responsibility for guaranteeing performance of the contract.

101.    By accepting a contract for clearing and novating the transaction, a DCO affirmatively enables the contract to function as a market instrument, guarantees settlement, and assumes legal and financial obligations with respect to the trade.

102.    The CEA therefore requires DCOs to establish rules governing contract eligibility and to enforce those rules in good faith.

103.    In the context of event contracts, this includes determining whether contracts presented for clearing are eligible under CFTC regulations, including Rule

31

40.11's prohibition on clearing certain public-interest-based event contracts, including the Sporting Event Contracts at issue here.

104.   Kalshi Klear LLC, the DCO Defendant, serves as the central counterparties for trades executed on the KalshiEX LLC's DCM, including the Sporting Event Contracts. Once a trade is executed on KalshiEX LLC, Kalshi Klear LLC steps in between the buyer and seller, guaranteeing performance of the contract, managing financial risk associated with open positions, and facilitating settlement when the contract is resolved.

### D.    Self-Regulatory Obligations and Core Principles

105.   A central feature of the CEA is self-regulation. Congress deliberately placed primary responsibility for market integrity on registered entities themselves, subject to CFTC oversight.

106.   In fact, the CFTC Chairman, Michael Selig, recently confirmed that the regulator does not exercise its oversight obligations by policing what contracts people should trade.[12]

107.   To that end, the CEA imposes self-regulatory obligations and "core principles" on DCMs and DCOs that function as ongoing statutory duties.

108.   Among other things, these obligations and core principles require these

---

[12] https://www.financemagnates.com/forex/regulation/cftc-chief-just-said-we-do-not-decide-what-you-should-trade/

32

registered entities to:

a.    Maintain rules designed to prevent violations of the CEA[13];

b.    Monitor compliance with those rules[14];

c.    Enforce those rules consistently and in good faith[15]; and

d.    Avoid listing or clearing contracts that the CFTC has determined to be contrary to the public interest.[16]

109.    These self-regulatory obligations require registered entities to integrate and apply Commission regulations when establishing, monitoring, and enforcing their own contract and market rules.[17]

110.    The CEA therefore does not permit a registered entity to disclaim responsibility by pointing to market demand or participant behavior.

111.    If a contract violates the CEA, CFTC regulations, or the entity's own rules, the registered entity must not list or clear it, regardless of whether customers wish to trade it.

E.    **Chief Executive Officers**

112.    In companies operating CFTC-registered DCMs and DCOs, the CEO

---

[13] 7 U.S.C. § 7(d)(2)(A); 7 U.S.C. § 7a-1(c)(2)(A)(i); 7 U.S.C. § 7a-1(c)(2)(C)(i)(II); 17 C.F.R. § 39.10(c).
[14] 7 U.S.C. § 7(d)(2)(A); 17 C.F.R. § 39.17(a)(1).
[15] 7 U.S.C. § 7(d)(2)(A); 7 U.S.C. § 7a-1(c)(2)(A)(i); 17 C.F.R. § 39.17(a)(1).
[16] 7 U.S.C. § 7a-2(c)(5)(C)(ii); 17 C.F.R. § 40.11.
[17] 7 U.S.C. § 7(d)(2)(A); 7 U.S.C. § 7a-1(c)(2)(A)(i).

typically serves as the senior executive responsible for overall governance, strategic direction, and regulatory posture of the organization. Because the CEA relies on a system of self-regulation, registered entities must maintain compliance with statutory core principles and implement regulations on an ongoing basis, which necessarily requires executive-level oversight and accountability.

113.  At such entities, the CEO generally oversees decisions affecting the scope of contracts offered, the continuation or expansion of trading and clearing activities, and the allocation of resources necessary to satisfy regulatory obligations.

114.  The CEO's role commonly includes ensuring that the organization maintains appropriate governance structures, staffing, and internal controls to support compliance with the CEA and CFTC rules applicable to exchange and clearing operations.

115.  Where a corporate group includes affiliated entities performing exchange and clearing functions, executive leadership at the CEO level commonly coordinates oversight across those entities to ensure that the organization's regulated activities operate cohesively and in accordance with applicable regulatory requirements.

### F.    Chief Operating Officers

116.  In companies operating DCMs and DCOs, the COO typically bears primary responsibility for the daily operational execution of the organization's

34

regulatory and business functions. While strategic direction is set at the executive level, the COO generally oversees the systems, processes, and personnel through which the entity's obligations under the CEA are carried out in practice.

117.   For DCM operations, this commonly includes responsibility for the operational administration of trading platforms, implementation of contract terms, and the processes used to support rule enforcement, surveillance, and market operations.

118.   For DCO operations, the COO's role generally encompasses oversight of clearing functions, including contract acceptance, novation, settlement processes, and operational risk-management systems.

119.   Because compliance with the CEA's core principles and obligations depends on an entity's actual operational capacity, the COO's responsibilities directly affect whether the organization meets its regulatory obligations on a continuing basis. In firms operating both exchange and clearing functions, the COO often coordinates operational activity across those functions to ensure that contracts approved at the exchange level are implemented and processed consistently through clearing and settlement.

### G.   Chief Compliance Officers

120.   To ensure compliance with these obligations, the CEA and CFTC regulations require DCMs and DCOs to appoint a Chief Compliance Officer,

otherwise referred to as a CCO, as well as an adequate compliance staff. 7 U.S.C. § 7a-1(i); 17 C.F.R. § 38.155; 17 C.F.R. § 39.10(c).

121.   The CCO and compliance staff are responsible for overseeing the entity's compliance with the CEA and CFTC regulations and for establishing policies and procedures designed to prevent violations. 7 U.S.C. § 7a-1(i); 17 C.F.R. § 38.155; 17 C.F.R. § 39.10(c).

122.   The CEA treats compliance oversight as a substantive responsibility, not a formality.

123.   A registered entity's failure to implement adequate compliance systems, or to enforce its own compliance rules, can give rise to liability under the statute.

### H.   Prohibition of Listing and Clearing Event Contracts Involving, Related to or Referencing Gaming

124.   While the CEA permits registered entities to list for trading and to accept for clearing swaps and other contracts based on certain future events, Congress authorized the CFTC to impose explicit limits on event contracts that the Commission "may determine . . . are contrary to the public interest."[18]

125.   These public-interest limitations are implemented, in part, through Rule 40.11, which expressly prohibits registered entities from listing for trading or accepting for clearing any event contract that involves, relates to, or references

---

[18] 7 U.S.C. § 7a-2(c)(5)(C)(i).

gaming. *See* 17 C.F.R. 40.11.

126.   Specifically, Rule 40.11 states:

"A registered entity *shall not list for trading or accept for clearing* on or through the registered entity any of the following: (1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that *involves, relates to, or references* terrorism, assassination, war, *gaming*, or an activity that is unlawful under any State or Federal law." (Emphasis added).

127.   The front-line responsibility for enforcing these prohibitions rests squarely with the registered entities themselves.

128.   Accordingly, when a DCM lists an event contract, or a DCO clears it, the entity is required to determine whether that contract complies with the CEA's public-interest limitations, including the blanket prohibition on gaming-related contracts.

129.   Failure to do so is not a regulatory technicality; it is a core violation of the self-regulatory framework Congress established under the CEA.

I.     **Kalshi's Sporting Events Contracts are Prohibited "Gaming" Contracts.**

130.   There are two ways to interpret the prohibition on listing and clearing "gaming" contracts in Rule 40.11. As one district court found, "'gaming,' as used in the special rule, refers to [1] playing games or [2] playing games for stakes." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC),

2024 WL 4164694, at *10 (D.D.C. Sept. 12, 2024).[19] Kalshi's Sporting Event Contracts are prohibited under both interpretations.

131. The first interpretation is that each Sporting Event Contract "references" gaming because the contracts pay out on the basis of sports games' final scores or events that occur during sports games.

132. The Kalshi Defendants' Sporting Event Contracts constitute prohibited gaming contracts because they relate to sports gaming.

133. Namely, the Kalshi Defendants list and clear contracts based on, among other things, which team will win certain games, by how many points, and player performance metrics, as the below figures demonstrate.



---

[19] The "special rule" to which this refers is the prohibition on listing or clearing of event contracts that are contrary to the public interest in Section 5c(c)(5)(C). 7 U.S.C. § 7a-2(c)(5)(C).



134.   By "referenc[ing]" sports games, these types of contracts violate Rule 40.11 and Section 5c(c)(5)(C)(i)(V) of the CEA.[20]

135.   The second interpretation is that each Sporting Event Contract "involve[s]" gaming because the contracts constitute gambling.

136.   Merriam Webster defines gaming as "the practice or activity of playing games for stakes" and also refers to the "gambling" definition.

137.   The Cambridge Dictionary defines gaming as "the risking of money in

---

[20] 7 U.S.C. § 7a-2(c)(5)(C)(i)(V)

games of chance, especially at a casino" and includes "gambling & bookmaking" are "related words and phrases."

138.    Past CFTC commissioners, and CEA legislative history, recognize that the gaming prohibition was intended to prevent gambling, including sports gambling.

139.    Rule 40.11 prohibits the Kalshi Defendants' Sporting Event Contracts because they involve, relate to, or reference gaming.

140.    These types of contracts are traditional sports gaming offerings that violate Rule 40.11 and Section 5c(c)(5)(C)(i)(V) of the CEA.[21]

### J.    Kalshi Defendants Listed and Cleared the Sporting Events Contracts in Bad Faith, Fully Aware They Were Prohibited Gaming Contracts.

141.    In prior litigation in 2024, before it started listing and clearing Sporting Events Contracts, the Kalshi Defendants admitted such gaming contracts should not be listed: ["T]he classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." *KalshiEX LLC v. Commodity Futures Trading Commission*, 23-cv-03257, 2024 WL 4802698, *41 (D.D.C. 2024).

142.    The Kalshi Defendants further admitted that "[e]vidently, Congress sought to prevent exchanges [like Kalshi] from facilitating casino-style or sports

---

[21] 7 U.S.C. § 7a-2(c)(5)(C)(i)(V).

gambling. On a policy level, that makes some sense: The basic purpose of Designated Contract Markets is to allow 'hedging' of economic risk." *Id*. at *45.

143.   The Kalshi Defendants even admitted that "the word 'gaming' on its face--and in accord with its legislative history--is concerned with casino gambling and sports . . .." *Id*. at *50.

144.   Kalshi also admitted that the types of Sporting Event Contracts it currently lists -- for example, football[22] and golf[23] -- are "gaming" contracts: "you can see it in the congressional record, and they give three examples of gaming contracts: Football, horseracing, golf. They're all games. It's something that has no inherent economic significance. It's something done for amusement. It may be done purely to facilitate the betting itself for its own sake."[24]

145.   The Kalshi Defendants also told the Court: "The 'gaming' category reaches contracts contingent on games—for example, …whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder sports gambling through the derivatives markets."[25] Prior to hitting $1 billion in Super

---

[22] https://kalshi.com/category/sports/football
[23] https://kalshi.com/category/sports/golf
[24] Motion for Summary Judgment Hearing Tr. 15:4-11. KalshiEX LLC v. Commodity Futures Trading Comm'n, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025)
[25]Plaintiff's Memorandum of Law in Support of Motion For Summary Judgment at 16. KalshiEX LLC v. Commodity Futures Trading Comm'n, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024)

Bowl trades, the Kalshi Defendants even admitted that "If you have an event contract on who's going to win the Super Bowl or the point spread in the Super Bowl, it involves a game."[26]

146.   The Kalshi Defendants also conceded that "[c]ontracts that involve games are probably not the types of contracts that we want to be listed on an exchange, because they don't have any real economic value to them."[27]

147.   The Kalshi Defendants have further acknowledged that "[c]ontracts that 'serve [no] commercial purpose at all' may therefore not deserve to be traded on a regulated exchange. And, at least in general, contracts related to *games*—again, activities conducted for diversion or amusement—are unlikely to serve any commercial or hedging interest."[28]

148.   Nevertheless, and despite their prior admissions that the Sporting Event Contracts involve gaming, the Kalshi Defendants listed and cleared the Sporting Event Contracts anyway.

149.   Further, the Kalshi Defendants have received numerous cease-and-desist letters from state attorneys general across the country demanding that they stop listing Sporting Event Contracts on the grounds that they constitute gaming

---

[26] 26 Motion for Summary Judgment Hearing Tr.14:9-13. KalshiEX LLC v. Commodity Futures Trading Comm'n, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024)
[27] *Id.* at 15:13-16.
[28] Kalshi Appellee's Brief at 45.

under state law, yet the Kalshi Defendants continue to list these contracts.

150. State Attorneys General and gaming commissions in Arizona,[29] Illinois,[30] Maryland,[31] Montana,[32] Nevada,[33] New Jersey,[34] New York,[35] Connecticut,[36] and Ohio[37] have sent letters ordering the Kalshi Defendants to cease and desist offering illegal sports gaming under the guise of prediction markets.

151. The Massachusetts Attorney General similarly concluded the Kalshi Defendants' "event contracts" are illegal sports gaming and brought a lawsuit, which resulted in a preliminary injunction against the Kalshi Defendants.[38]

152. In some states, Kalshi has been preliminarily enjoined from listing Sporting Events Contracts as the state enforcement actions continue. In other states, Kalshi continues to operate despite the cease-and-desist letters.

---

[29] https://www.ingame.com/arizona-regulators-kalshi-cd-order/
[30] https://www.illinois.gov/content/dam/soi/en/web/igb/documents/sports/cease-and-desist-letters/20250401-cease-desist-letter-kalshi.pdf
[31] https://www.mdgaming.com/wp-content/uploads/2025/04/Kalshi-4-7-25.pdf
[32] https://nexteventhorizon.substack.com/p/news-montana-told-kalshi-to-stop
[33] https://www.gaming.nv.gov/siteassets/content/about/press-release/NGCB_-_News_Release_-_KalshiEX_Cease_and_Desist_Order__3-4-2025.pdf
[34] https://www.nj.gov/oag/ge/docs/EmergencyOrders/Kalshi2025.pdf
[35] https://gaming.ny.gov/system/files/documents/2026/03/2025-10-24-williams-to-kalshi.pdf
[36] https://portal.ct.gov/dcp/-/media/dcp/news-releases-from-the-department-of-consumer-protection/2025/cease-and-desist---kalshiex-llc---case-no-2025-77.pdf?rev=bf04b7e8a4994a21a1e4960356036d4a&hash=E224C26FE80D14E896585AA7625361EC
[37] https://closingline.substack.com/p/the-current-inside-the-kalshi-ohio-letter
[38] https://www.mass.gov/news/ag-campbell-secures-court-order-that-will-block-kalshi-from-offering-unlawful-sports-wagers-in-massachusetts

153.   The Kalshi Defendants' continued operation despite repeated state enforcement actions demonstrates their knowledge of the prohibited nature of the Sporting Event Contracts and their willful disregard of regulatory requirements.

154.   In addition to targeting people in states where sports gaming is illegal or highly restricted, the Kalshi Defendants also target vulnerable populations, particularly users aged 18 to 20, in states where sports gaming is restricted to those 21 and older, demonstrating an improper profit motive without consideration for the legal or regulatory consequences.

155.   Such age restrictions are in place because of the highly addictive nature of gambling.

156.   The Kalshi Defendants have employed aggressive marketing tactics targeting college students and users aged 18 to 20, including a "College Ambassadors" program designed to promote gambling on campuses.[39]

157.   Studies indicate that 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling weekly and 4% daily. Problem gambling among this demographic carries severe consequences, including financial ruin and elevated suicide risk.[40]

---

[39] https://www.wsj.com/business/media/prediction-markets-campus-e57cd19f?st=f8Sk4E&reflink=article_email_share

[40] https://ncaaorg.s3.amazonaws.com/research/wagering/Apr2023NCAA_Wagering KeyFindings.pdf

158.   A study from the University of California San Diego found sports betting affects lower-income consumers, who spend as much as 10% of their income on gambling.[41]

159.   The Kalshi Defendants make unlawful gambling widely available to the public through their online and mobile platforms, presenting broader swaths of the population with the attendant risks of gambling without any of the safeguards found in licensed sportsbooks.

160.   The Kalshi Defendants also use deceptive marketing.

161.   The Kalshi Defendants have advertised themselves as the "First Nationwide Legal Sports Betting Platform."

162.   The Kalshi Defendants ran advertisements stating "POV: You just found out that you can legally bet on the NFL in all 50 states using Kalshi."

163.   The Kalshi Defendants ran ads pretending to be news articles, stating, "Breaking News: Sports Betting in California is Now Legal: New York-headquartered prediction market Kalshi has legalized sports betting in all 50 states."

164.   These misleading advertisements demonstrate the Kalshi Defendants' knowledge that they are operating a sports betting platform and their intent to circumvent state and federal gaming regulations.

---

[41] https://www.universityofcalifornia.edu/news/legalized-gambling-increases-irresponsible-betting-behavior-especially-among-low-income

165.    Considering the plain language of the regulatory prohibition, the Kalshi Defendants' own prior judicial admissions, their continued operation despite enforcement actions, their targeting of vulnerable populations, and their deceptive advertising, the Kalshi Defendants knew Sporting Event Contracts were prohibited and acted in bad faith with a self-interested motive, prioritizing revenue generation and market expansion over statutory and regulatory duties.

### K.    Private Enforcement Under the CEA

166.    Recognizing that registered entities' self-regulation alone would be insufficient, Congress created a private right of action under section 22(b) of the CEA, codified at 7 U.S.C. § 25(b).

167.    This provision allows market participants to recover damages when registered entities fail to enforce, or improperly enforce, the rules and statutory or regulatory duties they are required to uphold.

168.    7 U.S.C. § 25(b) specifically applies to DCMs, DCOs, and their officers and employees and reflects Congress's judgment that registered entities must be accountable not only to regulators, but also to those harmed when exchanges and clearinghouses disregard their legal obligations.

## V.    THE KALSHI DEFENDANTS' VIOLATIONS FALL INTO THREE CATEGORIES.

### A.    Violation 1 – Listing and Enforcing the Terms of Sporting Event Contracts on KalshiEX LLC

169.   KalshiEX LLC is registered with the CFTC as a DCM.

170.   As a registered DCM, KalshiEX LLC is subject to the CEA and CFTC regulations thereunder governing the listing and operations regarding the trading of event contracts.

171.   Two provisions of the CEA are most relevant. First, Section 5(d)(2)(A) requires DCMs to "establish, monitor, and enforce compliance with the rules of the contract market, including … the terms and conditions of any contracts to be traded on the contract market."[42]

172.   Second, Section 5c(c)(5)(C)(ii) of the CEA prohibits DCMs from listing or making available for trading certain event contracts that the CFTC determines are contrary to the public interest, including contracts "involv[ing]" "gaming."[43] The CFTC has enacted Rule 40.11, which prohibits DCMs from listing for trading event contracts "that involves, relates to, or references … gaming."[44] Rule 40.11, therefore, establishes that event contracts that involve, relate to, or reference "gaming" violate the public interest and are prohibited under Section 5c.

173.   Each event contract is governed by a set of rules, known as terms and conditions, that detail, *inter alia*, the contract's underlying event, payout criteria, and procedures for determining outcomes and settlement.

---

[42] 7 U.S.C. § 7(c)(2)(A).
[43] 7 U.S.C. 7a-2(c)(5)(C)(ii).
[44] 17 C.F.R. § 40.11.

174. When KalshiEX LLC lists an event contract, administers trading in that contract, and determines whether contractual conditions have occurred, it enforces the rules governing that contract within the meaning of the CEA. KalshiEX LLC, Defendant Beardsley, and the other Executive Officer Defendants are required to monitor and enforce compliance with these rules.

175. KalshiEX LLC listed for trading—and accordingly enforced the rules governing—Sporting Event Contracts that fall within Rule 40.11's prohibition of contracts based on gaming-related events.

176. By listing those contracts for trading and enforcing their rules (i.e., their terms and conditions) pursuant to Section 5 of the CEA, KalshiEX LLC enforced rules in a manner that violated Section 5c of the CEA and CFTC regulations, including Rule 40.11.

177. As a result, KalshiEX LLC is liable for this violation under Section 22(b)(1)(C) of the CEA.[45]

178. Moreover, by listing Sports Event Contracts for trading and enforcing their rules, KalshiEX LLC failed to enforce Rule 40.11 and the rule contained in Section 5c(c)(5)(C)(ii) of the CEA prohibiting it from listing event contracts that the CFTC has determined are contrary to the public interest, including contracts based on gaming.

---

[45] 7 U.S.C. § 25(b)(1)(C).

179. As a result, KalshiEX LLC is liable for this violation under Section 22(b)(1)(A) of the CEA.[46]

## B. Violation 2 – Clearing and Novating Sporting Event Contracts on KalshiEX LLC and Failing to Oversee Defendant Beardsley

180. Kalshi Klear LLC is registered with the CFTC as a DCO.

181. As a registered DCO, Kalshi Klear LLC is subject to the CEA and CFTC regulations thereunder governing the clearing and operations regarding the clearing of event contracts.

182. Section 5b(c)(2)(A)(i) of the CEA requires DCOs to "comply with each core principle described in this paragraph."[47] One such core principle is found in Section 5b(c)(2)(H)(i), which requires DCOs to "maintain adequate arrangements and resources for … the effective monitoring and enforcement of compliance with [their own] rules."[48] Collectively, these two provisions require each DCO to effectively monitor and enforce compliance with its rules.

183. Rule 2.3 of Kalshi Klear LLC's rulebook ("Kalshi Klear Rule 2.3") provides that the "Chief Compliance Officer must … fulfill his or her duties as required pursuant to CFTC Regulations[.]" (Kalshi Klear Rule 2.3)

---

[46] 7 U.S.C. § 25(b)(1)(C).
[47] *Id.* § 7a-1(c)(2)(A)(i).
[48] *Id.* § 7a-1(c)(2)(H)(i).

184. Kalshi Klear Rule 2.3 thus incorporates by reference the obligations of Kalshi Klear LLC and its CCO under the CEA and CFTC Regulations. These obligations include Rule 40.11's prohibition on clearing contracts that involve, relate to, or reference gaming. Incorporated obligations also include Rule 39.10, which imposes six responsibilities on a DCOs' CCO, including, *inter alia*, "[e]stablishing and administering written policies and procedures reasonably designed to prevent violation of the Act" and "[t]aking reasonable steps to ensure compliance with the Act and Commission regulations relating to agreements, contracts, or transactions[.]"[49]

185. Kalshi Klear LLC's clearing operations—including acceptance, novation, and settlement—were governed by internal compliance obligations and clearing standards, including Rules 6.1 through 6.9 of its Rulebook ("Kalshi Klear Rules 6.1 through 6.9").

186. Kalshi Klear LLC; its CCO, Defendant Beardsley; and the other Executive Officer Defendants have a duty under Section 5b of the CEA to enforce Kalshi Klear LLC's own rules, including Kalshi Klear Rule 2.3 and Rules 6.1 through 6.9.

187. Moreover, Section 5b(c)(2)(A)(i) of the CEA requires DCOs to "comply with … any requirement that the Commission may impose by rule or

---

[49] 17 C.F.R. § 39.10.

regulation pursuant to section 8a(5)."[50] Section 8a(5) is the CFTC's general rulemaking authority. *See* 7 U.S.C. § 12a(5) (authorizing the CFTC "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter"). Collectively, these two provisions require each DCO to comply with the CFTC's regulations.

188.   One such applicable regulation is Rule 39.17, which requires DCOs to "[m]aintain adequate arrangements and resources for the effective monitoring and enforcement of compliance (by itself and its clearing members) with the rules of the derivatives clearing organization[.]"[51]

189.   This rule, promulgated pursuant to section 8a(5), requires Kalshi Klear LLC to enforce its own rules, including Kalshi Klear Rule 2.3 and Rules 6.1 through 6.9.[52]

190.   Kalshi Klear LLC and Defendant Beardsley violated the CEA and CFTC regulations by failing to enforce Kalshi Klear Rule 2.3. They did not implement reasonable policies and procedures concerning Rule 40.11, nor did they

---

[50] *Id.* § 7a-1(c)(2)(A)(i).

[51] 17 C.F.R. § 39.17(a)(1).

[52] *See* https://www.govinfo.gov/content/pkg/FR-2011-11-08/pdf/2011-27536.pdf (promulgating that Rule 39.17 and associated rules in response to Congress's "express[] confirm[ation] that the Commission may adopt implementing rules and regulations pursuant to its rulemaking authority under Section 8a(5) of the CEA").

take reasonable steps to ensure compliance with Rule 40.11's prohibition on accepting for clearing gaming contracts, as evidenced by their clearing of the Sporting Event Contracts that are based on gaming. Moreover, they did not comply with Rule 39.10, as Defendant Beardsley, the CCO, neither established policies "reasonably designed to prevent violations of the [CEA]," nor took "reasonable steps to ensure compliance with the [CEA] and Commission regulations[.]"

191. Despite these obligations, Sporting Event Contracts were routinely accepted for clearing, novation, and payment in violation of Section 5c of the CEA and Rule 40.11. Kalshi Klear LLC did not halt, reject, or condition clearing of these contracts, even though their subject matter placed them squarely within the category of contracts requiring heightened scrutiny.

192. As a result, Kalshi Klear LLC is liable for this violation under Section 22(b)(1)(A) of the CEA.[53]

193. Moreover, in the course of clearing, novating, and settling Sporting Event Contracts, Kalshi Klear LLC enforced Kalshi Klear Rules 6.1 through 6.9, causing Kalshi Klear LLC to violate Section 5c of the CEA and CFTC Rule 40.11.

194. As a result, Kalshi Klear LLC is liable for this violation under section 22(b)(1)(C) of the CEA.[54]

---

[53] 7 U.S.C. § 25(b)(1)(A).
[54] 7 U.S.C. § 25(b)(1)(C).

**C.    Violation 3 – Clearing Sporting Event Contracts Without Required Contract-Eligibility Rules.**

195.    Section 5b(c)(2)(C)(i)(II) of the CEA requires DCOs to "establish … appropriate standards for determining the eligibility of agreements, contracts, or transactions submitted to the derivatives clearing organization for clearing."[55]

196.    In addition to failing to enforce existing Kalshi Klear Rule 2.3, Kalshi Klear LLC separately failed to enforce the rule contained in Section 5b(c)(2)(C)(i)(II) by failing to include appropriate standards for determining contract eligibility in its rulebook.

197.    This deficiency has a direct impact on the completeness of Kalshi Klear LLC's rulebook, as it now lacks the provision explicitly mandated by the CEA.

198.    The absence of this required rule undermines the regulatory framework by failing to ensure that Kalshi Klear LLC adopts and enforces the necessary policies and procedures intended to prevent violations of the CEA and corresponding CFTC regulations.

199.    In other words, Kalshi Klear LLC has no mechanism in place to ensure its Sporting Event Contracts comply with the CEA or CFTC regulations.

---

[55] 7 U.S.C. § 7a-1(c)(2)(C)(i)(II).

200. The inadequacy of Kalshi Klear LLC's rulebook is evidenced by the routine clearing of Sporting Event Contracts. Had Kalshi Klear LLC promulgated appropriate eligibility standards, it would have identified and rejected these contracts as prohibited gaming contracts before clearing.

201. As a result, Kalshi Klear LLC is liable for this violation under Section 25(b)(1)(A) of the CEA.

## VI.    THE JOINT AND COORDINATED OPERATION OF THE KALSHI PLATFORM

202. On information and belief, the DCM (KalshiEX LLC), DCO (Kalshi Klear LLC), each of the Executive Officer Defendants (CEO, COO, CCO) and Kalshi Klear Inc. are all Kalshi Inc.'s agents.

203. Defendant Kalshi Inc. is the ultimate parent and holding company of the Kalshi enterprise. It wholly owns KalshiEX LLC, the DCM Defendant; and wholly owns Kalshi Klear Inc., which in turn owns Kalshi Klear LLC, Kalshi Klear LLC.

204. The Kalshi Defendants and Defendants Mansour, Lopes Lara, and Beardsley have expressly represented to federal regulators that Kalshi Inc. and Kalshi Klear Inc. function solely as holding companies, while KalshiEX LLC (DCM) and Kalshi Klear LLC (DCO) are the operating companies that carry out the core business of the Kalshi Platform on their behalf.

205.    On information and belief, no Kalshi Defendant operated at arm's length, and none lacked the ability to influence whether the challenged conduct occurred. Instead, they are vertically integrated, wholly owned, and organized to function together as a single, unified commercial enterprise that offers, trades, clears, settles, and profits from event contracts through the Kalshi Platform. KalshiEX LLC (as DCM) cannot offer or consummate a transaction without its DCO -- Kalshi Klear LLC -- clearing and settling it, and Kalshi Klear LLC only clears transactions executed on the Kalshi Platform.

206.    Each entity performs indispensable, sequential functions in the same transaction flow, rendering their operations interdependent and inseparable, all for a common benefit.

207.    On information and belief, Kalshi Inc., as the holding company, exercises centralized control over the enterprise and acts through its operating subsidiaries as agents.

208.    On information and belief, Kalshi Inc. controls all aspects of the business and the transactions through each of the other Kalshi Defendants and the Executive Officer Defendants.

209.    Kalshi Inc. directs the overall business strategy and policies of the Kalshi Platform, including branding, marketing, platform design, data collection, user relationships, and the uniform terms and policies governing all users. The

DCM Defendant, DCO Defendant, Defendant Kalshi Klear Inc. and Defendants Mansour, Lopes Lara, and Beardsley implement those policies in their respective operational roles, exchange execution and clearing/settlement, subject to common ownership, shared leadership, and aligned economic incentives.

210. In carrying out those functions, each operating entity acts within the course and scope of its agency for Kalshi Inc. and for the enterprise as a whole.

211. And all Kalshi Defendants share the costs and profits related to their common efforts.

212. The Kalshi Defendants also hold themselves out to the public as a single company, "Kalshi," rather than as separate corporate actors.

213. Public-facing statements and user-facing materials routinely state that "Kalshi is regulated as a Designated Contract Market," without distinguishing between Kalshi Inc. and KalshiEX LLC, the entity formally registered with the CFTC as the DCM. This deliberate blurring of corporate lines reflects Kalshi's own treatment of the enterprise as a unified operation rather than a collection of independent companies.

214. On information and belief, Kalshi Inc. operates exclusively through KalshiEX LLC and Kalshi Klear LLC, and because those operating companies carry out Kalshi Inc.'s business under its direction and control, each Kalshi Defendant acted as the agents of the others.

56

215. The acts, contacts, and forum-directed conduct of each Defendant, including offering event contracts, establishing the contracts terms and conditions, accepting user funds, clearing trades, paying out winnings, and sharing in the collected fees, are therefore properly imputed to all Kalshi Defendants.

216. The Kalshi Defendants and Defendants Mansour, Lopes Lara, Beardsley Inc. did not merely act in parallel or in a loose corporate affiliation. They jointly undertook, coordinated, and executed the same commercial endeavors: the creation, marketing, listing, trading, clearing, settlement, and monetization of event contracts, particularly the Sporting Event Contracts, through the Kalshi Platform.

217. Each Defendant knowingly participated in a shared undertaking in which responsibilities were deliberately divided but functionally inseparable.

218. KalshiEX LLC listed and administered the contracts; Kalshi Klear LLC cleared, novated, guaranteed, and settled those same contracts; and Kalshi Inc. and Kalshi Klear Inc. directed, financed, governed, branded, and profited from the operation as a whole.

219. These activities were not independent, optional, or incidental. They were coordinated steps in a single course of conduct designed to generate transaction volume and revenue from the same users, the same contracts, and the same Kalshi Platform.

220.   On information and belief, decisions to enter the sports-based markets, to persist despite regulatory risk, and to promote the contracts nationwide were made and implemented across the Kalshi entities pursuant to unified leadership, overlapping governance, and centralized strategic control.

221.   The Kalshi Defendants, including Defendants Mansour, Lopes Lara, and Beardsley, also shared directly in the financial benefits of the enterprise.

222.   Revenues generated by trading, clearing, and platform activity were derived from the same pool of transactions and flowed through the Kalshi corporate structure for the collective benefit of the Kalshi Defendants.

223.   The success of each entity depended on the success of the others, and each Defendant's compensation was tied to the volume and continuation of the same Sporting Event Contracts.

224.   Through this coordinated conduct, shared decision-making, integrated operations, and joint pursuit of profit, the Kalshi Defendants collectively carried out the conduct giving rise to Plaintiff's claims.

## VII.   PROXIMATE CAUSE AND DAMAGES

225.   Plaintiff's and Class members' injuries flowed from a single, integrated course of unlawful conduct: Defendants' creation, listing, marketing, clearing, novation, enforcement, and settlement of Sporting Event Contracts on the

58

Kalshi Platform that were prohibited by federal law and therefore should never have existed.

226.    But for the decision to list Sporting Event Contracts in violation of CFTC Rule 40.11, to accept those contracts for clearing and novation, and to enforce exchange and clearing rules implementing those contracts, Plaintiff and Class members would not have been able to enter into the challenged transactions and would not have suffered the resulting losses.

227.    Each Defendants' conduct was a substantial factor in causing Plaintiff's and the Class's injuries. KalshiEX LLC's listing and administration of the Sporting Event Contracts, Kalshi Klear LLC's clearing and novation of those same contracts, and the coordinated control, oversight, and facilitation by Kalshi Inc., Kalshi Klear Inc., and the Executive Officer Defendants collectively enabled the transactions that caused Plaintiff's and the Class's losses.

228.    The injuries alleged were the foreseeable and intended consequence of Defendants' conduct. Defendants designed, promoted, and operated the Kalshi Platform to induce users nationwide to trade Sporting Event Contracts, knowing that those users would risk money on contracts whose outcomes necessarily produce winners and losers.

229.    Plaintiff and Class members were not harmed by independent market forces, intervening causes, or third-party conduct. Their losses arose solely from

59

transactions Defendants unlawfully made available, administered, cleared, and enforced in violation of the CEA.

230.    Because Defendants operated as an integrated enterprise and jointly participated in the unlawful conduct, each Defendant is liable for losses proximately caused by that conduct.

231.    Plaintiff and Class members suffered concrete economic harm in the form of money or other things of value lost on Sporting Event Contracts, along with transaction fees and related costs, all of which were proximately caused by Defendants' violations of the CEA.

## VIII.  CLASS ACTION ALLEGATIONS

232.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

233.    Plaintiff seeks to represent the following Nationwide Class:

All persons in the United States who traded Sporting Event Contracts on the Kalshi Platform and suffered a financial loss on such trades (the "Class").

234.    Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff

assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

235.   This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

236.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are hundreds to thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

237.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a.  Whether the Sporting Event Contracts offered on the Kalshi Platform constitute "gaming" contracts prohibited by CFTC Rule 40.11.

61

b.  Whether KalshiEX LLC listed Sporting Event Contracts that constitute prohibited gaming contracts in violation of CFTC Rule 40.11 and the CEA.

c.  Whether Kalshi Klear LLC accepted for clearing, cleared, novated, and settled Sporting Event Contracts that constitute prohibited gaming contracts in violation of the CEA and CFTC regulations.

d.  Whether Kalshi Klear LLC violated the CEA by clearing Sporting Event Contracts in violation of its own contract-eligibility rules and compliance obligations.

e.  Whether Kalshi Klear LLC failed to promulgate and enforce required contract-eligibility standards prohibiting the clearing of gaming-based event contracts.

f.  Whether KalshiEX LLC enforced exchange rules governing Sporting Event Contracts in a manner that violates CEA and CFTC regulations.

g.  Whether Kalshi Klear LLC enforced clearing, novation, and settlement rules for Sporting Event Contracts in a manner that violates the CEA and CFTC regulations.

h.  Whether each Executive Officer Defendant knowingly and willfully aided and abetted the listing, clearing, and enforcement of prohibited gaming contracts.

i. Whether Defendant Kalshi Inc. knowingly aided and abetted the DCM and DCO Defendants' violations of the CEA.

j. Whether Defendant Kalshi Klear Inc. knowingly aided and abetted Kalshi Klear LLC's violations of the CEA.

k. Whether Defendant Kalshi Inc. is derivatively liable for KalshiEX LLC's and Kalshi Klear LLC's violations under principles of veil piercing.

l. Whether Defendant Kalshi Klear Inc. is derivatively liable for Kalshi Klear LLC's violations under principles of veil piercing.

m. Whether Plaintiff and Class members traded Sporting Event Contracts on the Kalshi Platform while located in the United States and suffered losses as a result.

n. The amount of money or other things of value wagered and lost by Plaintiff and Class members on Sporting Event Contracts;

o. Whether Class members are entitled to the relief sought; and

p. The amount and nature of relief to be awarded to Plaintiff and the other Class members.

238. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because Plaintiff and all Class members engaged in transactions on the Kalshi Platform by paying money or

other things of value to take positions in Sporting Event Contracts that Defendants listed, enforced, cleared, and settled in violation of the CEA and CFTC regulations. Plaintiff and the Class were injured in the same manner because they incurred losses on the Sporting Event Contracts that would not have existed but for Defendants' uniform, nationwide conduct in listing and clearing contracts based on gaming. Plaintiff's claims arise from the same statutory violations, the same course of conduct, and the same operative facts as the claims of the Class and are based on identical legal theories under 7 U.S.C. § 25(b). Defendants' liability turns on common proof concerning their contract-listing, clearing, compliance, and enforcement decisions, not on any individualized conduct of Plaintiff or Class members.

239. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

240. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

241. **Ascertainability** – Kalshi maintains a robust database of all its participants. To participate, each participant must create an account and select and verify his or her state of residence. Kalshi also assigns a unique, identifiable number to each participant's account.

## IX.    <u>CAUSES OF ACTION</u>

<u>**COUNT I**</u>
**Violation of the CEA, 7 U.S.C. § 25(b)(1)(A) & (C)**
Listing Prohibited Gaming Contracts
(Against KalshiEX LLC)

242. Plaintiff brings this Count individually and on behalf of the Class against KalshiEX LLC for committing the CEA violations categorized as Violation 1 above.

243. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

244. More specifically, KalshiEX LLC is registered with the CFTC as a DCM.

245. As a registered DCM, KalshiEX LLC is required by Section 5 and 5c of the CEA to establish, monitor, and enforce rules governing listed contracts, including compliance with CFTC Rule 40.11.

246. CFTC Rule 40.11 prohibits registered entities from listing for trading any event contract that involves, relates to, or references gaming.

247. KalshiEX LLC listed, offered for trading, administered, and enforced Sporting Event Contracts that are based on the outcomes of sporting events and player performance, which constitute prohibited gaming contracts under Rule 40.11.

248. By listing these contracts, KalshiEX LLC failed to enforce rules it was required to enforce pursuant to the CEA and CFTC regulations.

249. In addition, KalshiEX LLC established and enforced rules governing the terms, resolution, and settlement of Sporting Event Contracts. Those rules

implemented and enforced contracts prohibited by Rule 40.11. By enforcing rules that implement prohibited gaming contracts, KalshiEX LLC enforced its rules in a manner that violates the CEA.

250. As set forth above in Section IV(J), the DCM Defendant acted in bad faith with knowledge of the unlawfulness of the contracts and an ulterior profit motive.

251. As set forth above in Section VII, Plaintiff and Class members suffered actual losses proximately caused by this conduct.

252. KalshiEX LLC is liable to Plaintiff and the Class under 7 U.S.C. § 25(b)(1)(A) and (C).

## COUNT II
### Violation of the CEA, 7 U.S.C. § 25(b)(1)(A) & (C)
Clearing Prohibited Gaming Contracts
(Against Kalshi Klear LLC)

253. Plaintiff brings this Count individually and on behalf of the Class against Kalshi Klear LLC for committing the CEA violations categorized as Violation 2 above.

254. Plaintiff realleges and incorporates by reference all preceding paragraphs.

255. More specifically, Kalshi Klear LLC is registered with CFTC as a DCO.

256.   As a registered DCO, Kalshi Klear LLC is required by sections 5b and 5c of the CEA to establish, monitor, and enforce rules governing the acceptance for clearing, novation, and settlement of listed contracts; as well as to avoid accepting for clearing event contracts the CFTC has determined are contrary to the public interest.

257.   Accordingly, Kalshi Klear LLC enacted Kalshi Klear Rule 2.3, which provides that the "Chief Compliance Officer must … fulfill his or her duties as required pursuant to CFTC Regulations[.]" It also enacted Kalshi Klear Rules 6.1 through 6.9, which govern its acceptance, novation, and settlement of the contracts it clears.

258.   Kalshi Klear Rule 2.3 requires Kalshi Klear and its CCO to comply with the CEA and CFTC Regulations. This includes requirements to establish policies reasonably designed to prevent violating the CEA and taking reasonable steps to ensure compliance with the CEA. It also includes Rule 40.11, which prohibits registered DCOs from accepting for clearing any event contract that involves, relates to, or references gaming.

259.   Kalshi Klear LLC accepted for clearing, cleared, and novated Sporting Event Contracts traded on the Kalshi Platform, becoming the central counterparty and guaranteeing performance of prohibited gaming contracts. By clearing these contracts, Kalshi Klear LLC demonstrates its failure to enforce Kalshi Klear Rule

68

2.3. Had it done so, Kalshi Klear LLC would have had policies that would have prohibited it from accepting for clearing event contracts that involve, relate to, or reference gaming.

260.    Relatedly, the act of accepting for clearing, novation, and settlement of each Sporting Event Contract was accomplished by enforcing Kalshi Klear Rules 6.1 through 6.9. Those rules implemented and enforced contracts prohibited by Rule 40.11. By enforcing these rules, Kalshi Klear LLC violated the CEA and CFTC regulations.

261.    As set forth in Section IV(J) above, Kalshi Klear LLC acted in bad faith with knowledge of the unlawfulness of the contracts and an ulterior profit motive.

262.    As set forth in Section VII above, Plaintiff and the Class suffered losses directly caused by this clearing activity.

263.    Kalshi Klear LLC is liable under 7 U.S.C. § 25(b)(1)(A) and (C).

**COUNT III**
**Violation of the CEA, 7 U.S.C. § 25(b)(1)(A)**
Failure to Promulgate Contract Eligibility Rules Prohibiting Gaming Contracts
(Against Kalshi Klear LLC)

264.    Plaintiff brings this Count individually and on behalf of the Class against Kalshi Klear LLC for committing the CEA violations categorized as Violation 3 above.

265. Plaintiff realleges and incorporates by reference all preceding paragraphs.

266. More specifically, the CEA requires DCOs to establish appropriate standards for determining the eligibility of contracts submitted for clearing.

267. Kalshi Klear LLC failed to promulgate rules establishing standards that prohibit the clearing of gaming-based event contracts.

268. This failure allowed prohibited Sporting Event Contracts to be routinely cleared.

269. Kalshi Klear LLC failed to enforce statutory rule imposed by the CEA.

270. As set forth in Section IV(J), Kalshi Klear LLC acted in bad faith with knowledge of the unlawfulness of the contracts and an ulterior profit motive.

271. As set forth in Section VII, Plaintiff and Class members suffered actual losses proximately caused by this conduct.

272. Kalshi Klear LLC is liable under 7 U.S.C. § 25(b)(1)(A).

## COUNT IV
### Violation of the CEA, 7 U.S.C. § 25(b)(3)
Willful Aiding and Abetting
(Against Each of the Executive Officer Defendants)

273. Plaintiff brings this Count individually and on behalf of the Class against each of the Executive Officer Defendants for aiding, abetting inducing and procuring the violations set forth in Counts I through III.

70

274. Plaintiff realleges and incorporates by reference all preceding paragraphs.

275. More specifically, at all relevant times, each Executive Officer Defendant exercised authority and control, as officers of both KalshiEX LLC and Kalshi Klear LLC, over contract design, listing, clearing, compliance, and enforcement decisions.

276. Each Executive Officer Defendant knowingly and willfully aided, abetted, induced, and procured the violations alleged in Counts I through III.

277. As set forth in Section IV(J), Each Executive Officer Defendant acted with knowledge that Sporting Event Contracts constituted prohibited gaming contracts and with an ulterior motive unrelated to proper regulatory objectives.

278. As set forth in Section VII, Plaintiff and the Class were injured as a direct result.

279. Each Executive Officer Defendant is liable under 7 U.S.C. § 25(b)(3).

## COUNT V
Agency and Joint Venture Liability
(Against Defendant Kalshi Inc.)

280. Plaintiff brings this Count individually and on behalf of the Class against Kalshi Inc. This Count alleges that Kalshi Inc. is liable for the conduct of its agents and joint venture partners in Counts I through III, as alleged above.

71

281. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

282. More specifically, Defendant Kalshi Inc. is the parent and controlling entity of KalshiEX LLC and Kalshi Klear LLC and is one of the Kalshi Defendants as defined in this Complaint.

283. As alleged above, KalshiEX LLC (DCM) and Kalshi Klear LLC (DCO) are Kalshi Inc.'s agents and joint venture partners.

284. As alleged in Counts I through III, KalshiEX LLC and Kalshi Klear LLC violated the CEA and CFTC regulations by listing, clearing, enforcing, and failing to prohibit Sporting Event Contracts that constitute prohibited gaming contracts under CFTC Rule 40.11.

285. Kalshi Inc. is responsible for the violations of KalshiEX LLC and Kalshi Klear LLC because those entities were, at all relevant times, Kalshi Inc.'s agents and joint venture partners.

286. More specifically, Kalshi Inc. controls the actions of KalshiEX LLC and Kalshi Klear LLC, and these DCM and DCO entities work solely at the discretion and command of Kalshi Inc.

287. Kalshi Inc. and KalshiEX LLC and Kalshi Klear LLC also created a joint venture whereby they would create a prediction market exchange, list and clear the Sporting Event contracts, and share the operating costs and profits.

72

288. Kalshi Inc.'s conduct was a direct and proximate cause of Plaintiff's and Class members' losses because, absent Kalshi Inc.'s control, direction, and participation, the prohibited Sporting Event Contracts would not have been created, listed, cleared, or made available for trading.

289. Plaintiff and the Class were injured as a direct result.

290. Accordingly, Defendant Kalshi Inc. is liable to Plaintiff and the Class under 7 U.S.C. § 25(a)(1)(B) for aiding and abetting the CEA violations alleged in Counts I through III.

## COUNT VI
### Agency and Joint Venture Liability
### (Against Defendant Kalshi Klear Inc.)

291. Plaintiff brings this Count individually and on behalf of the Class against Defendant Kalshi Klear Inc. This Count alleges that Kalshi Klear Inc. is liable for the conduct of its agent, Kalshi Klear LLC, for violations as alleged in Counts II and III, as alleged above.

292. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

293. Defendant Kalshi Klear Inc. is the parent and controlling entity of Kalshi Klear LLC and is one of the Kalshi Defendants as defined in this Complaint.

294. As alleged in Counts II & III, Kalshi Klear LLC violated the CEA by clearing prohibited gaming contracts, violating and failing to promulgate required

rules, and enforcing clearing and settlement rules in a manner that violates the CEA and CFTC regulations.

295.   Defendant Kalshi Klear Inc. knowingly and willfully aided and abetted those violations within the meaning of 7 U.S.C. § 25(a)(1)(B).

296.   Kalshi Klear Inc. substantially assisted Kalshi Klear LLC's unlawful conduct by, among other things:

a. Owning and controlling the clearing infrastructure through which Sporting Event Contracts were accepted, novated, and settled;

b. Exercising governance and oversight authority over Kalshi Klear LLC's rulemaking, compliance, and risk-management functions;

c. Knowingly permitting the clearing and novation of Sporting Event Contracts that constitute prohibited gaming contracts under Rule 40.11; and

d. Failing to require or implement eligibility rules and compliance safeguards designed to prevent the clearing of prohibited contracts.

297.   Kalshi Klear Inc. acted with knowledge of the unlawful nature of the Sporting Event Contracts and with the intent to facilitate the clearing activity that generated clearing fees and sustained platform-wide revenue.

298. Kalshi Klear Inc.'s conduct was a substantial factor and proximate cause of Plaintiff's and Class members' losses because the clearing and novation of the prohibited contracts was essential to their existence and operation.

299. Plaintiff and the Class were injured as a direct result.

300. Accordingly, Defendant Kalshi Klear Inc. is liable to Plaintiff and the Class under 7 U.S.C. § 25(a)(1)(B) for aiding and abetting the CEA violations alleged in Counts II and III.

## COUNT VII
Alternative Veil Piercing
(On Behalf of Plaintiff and the Nationwide Class)
(Against Defendant Kalshi Inc.)

301. Plaintiff brings this Count individually and on behalf of the Class against Kalshi Inc.

302. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

303. This Count is alleged alternatively against Kalshi Inc. to pierce the corporate veil should discovery prove KalshiEX LLC (the DCM Defendant) and Kalshi Klear LLC (the DCO Defendant) (and it's parent Kalshi Klear Inc.) are not sufficiently funded and liquid to satisfy any judgment in this case.

304. Defendant Kalshi Inc. is the parent and controlling entity of both KalshiEX LLC and Kalshi Klear LLC (through Kalshi Klear Inc.) and is one of the Kalshi Defendants as defined in this Complaint.

75

305. As alleged in Count I, KalshiEX LLC violated the CEA and CFTC regulations by listing prohibited gaming contracts, enforcing rules in violation of the CEA, and failing to comply with mandatory statutory and regulatory obligations.

306. At all relevant times, Kalshi Inc. exercised pervasive control over KalshiEX LLC, including control over:

a. The design, scope, and launch of Sporting Event Contracts;

b. Platform-wide product strategy and revenue objectives;

c. Marketing, branding, and public representations holding the platform out as a single "Kalshi" enterprise;

d. Governance, oversight, and strategic decision-making affecting exchange operations; and

e. The policies and practices governing contract listing and enforcement.

307. KalshiEX LLC functioned as a mere instrumentality or alter ego of Kalshi Inc., and any purported corporate separateness between Kalshi Inc. and KalshiEX LLC was disregarded in practice.

308. Kalshi Inc. and KalshiEX LLC operated as an integrated enterprise, sharing common officers, unified branding, centralized decision-making, and a single economic objective of expanding sports-based trading volume.

309.    Treating Kalshi Inc. and KalshiEX LLC as separate entities would sanction a fraud or promote injustice as no meaningful distinction exists between them, and doing so would allow Kalshi Inc. to reap the benefits of KalshiEX LLC's unlawful conduct while evading liability for violations it directed and controlled.

310.    As alleged in Counts II and III, Kalshi Klear LLC violated the Commodity Exchange Act by clearing prohibited gaming contracts, violating and failing to promulgate required rules, and enforcing clearing and settlement rules in a manner that violates the CEA and CFTC regulations.

311.    At all relevant times, Kalshi Inc. exercised domination and control over Kalshi Klear LLC, through dominion and control over its parent Kalshi Klear Inc, including control over:

    a.  Clearing infrastructure and platform integration;

    b.  Risk management, compliance, and eligibility determinations;

    c.  Governance and oversight of clearing operations; and

    d.  Strategic decisions to continue clearing Sporting Event Contracts despite their prohibited nature.

312.    Kalshi Klear LLC lacked meaningful independence and operated as a mere conduit through which Kalshi Inc.. as the parent company of Kalshi Klear Inc, implemented its platform-wide sports-based business strategy.

313. Kalshi Inc, Kalshi Klear Inc. and Kalshi Klear LLC operated as a single, integrated enterprise, sharing centralized management, common officers, unified branding, and aligned financial interests.

314. Treating Kalshi Inc., Kalshi Klear Inc. and Kalshi Klear LLC as separate entities would work an inequitable result, as no meaningful distinction exists between them, and doing so would allow Kalshi Inc. to profit from clearing-based violations of the CEA while disavowing responsibility for conduct it directed and controlled.

315. Accordingly, under principles of veil piercing, Defendant Kalshi Inc. is liable for the CEA violations alleged in Counts I through III.

## COUNT VIII
Alternative Viel Piercing
(Against Defendant Kalshi Klear Inc.)

316. Plaintiff brings this Count individually and on behalf of the Class against Kalshi Klear Inc.

317. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

318. This Count is alleged alternatively against Kalshi Klear Inc. to pierce the corporate veil should discovery prove Kalshi Klear LLC is not sufficiently funded and liquid to satisfy any judgment in this case.

78

319. Defendant Kalshi Klear Inc. is the parent and controlling entity of Kalshi Klear LLC and is one of the Kalshi Defendants as defined in this Complaint.

320. As alleged in Counts II and III, Kalshi Klear LLC violated the Commodity Exchange Act by clearing prohibited gaming contracts, violating and failing to promulgate required rules, and enforcing clearing and settlement rules in a manner that violates the CEA and CFTC regulations.

321. At all relevant times, Kalshi Klear Inc. exercised domination and control over Kalshi Klear LLC, including control over:

a. Clearing infrastructure and platform integration;

b. Risk management, compliance, and eligibility determinations;

c. Governance and oversight of clearing operations; and

d. Strategic decisions to continue clearing Sporting Event Contracts despite their prohibited nature.

322. Kalshi Klear LLC lacked meaningful independence and operated as a mere conduit through which Kalshi Klear Inc. implemented its platform-wide sports-based business strategy.

323. Kalshi Klear Inc. and Kalshi Klear LLC operated as a single, integrated enterprise, sharing centralized management, common officers, unified branding, and aligned financial interests.

324.    Treating Kalshi Klear Inc. and Kalshi Klear LLC as separate entities would work an inequitable result, as no meaningful distinction exists between them, and doing so would allow Kalshi Klear Inc. to profit from clearing-based violations of the CEA while disavowing responsibility for conduct it directed and controlled.

325.    Accordingly, under principles of veil piercing, Defendant Kalshi Klear Inc. is derivatively liable for the CEA violations alleged in Counts II and III.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgement against Defendants and respectfully requests the Court grant the following relief:

A.    Certifying the Class, appointing Plaintiff as Class representative, and appointing the undersigned counsel as Class Counsel;

B.    Declaring Defendants' actions violative of the CEA and CFTC regulations;

C.    Awarding damages, including money or other things of value lost on Sporting Event Contracts offered on the Kalshi Platform;

D.    Awarding costs, including reasonable attorneys' fees, expert fees, and litigation costs;

E.    Awarding pre- and post-judgment interest; and

80

F.     Awarding any other such relief allowed by law the Court deems just and proper.

Dated: March 20, 2026         Respectfully Submitted,

<u>/s/ H. Clay Barnett, III</u>
H. Clay Barnett, III (GA Bar No. 174058)
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
Overlook II
2839 Paces Ferry Road, Suite 400
Atlanta, GA 30339
T: (334) 269-2343 / F: (334) 954-7555
Email: Clay.Barnett@BeasleyAllen.com

W. Daniel "Dee" Miles, III*
James Mitchell "Mitch" Williams*
Trenton H. Mann*
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C**.
272 Commerce Street
Montgomery, Alabama 36103-4160
T: (334) 269-2343 / F: (334) 954-7555
Email: dee.miles@beasleyallen.com
Email: mitch.williams@beasleyallen.com
Email: trent.mann@beasleyallen.com

**CARNEY BATES & PULLIAM, PLLC**
Joseph Henry (Hank) Bates, III*
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
T: (501) 312-8500 / F: (501) 312-8505
Email: hbates@cbplaw.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith*
867 Boylston Street 5th Floor #1520
Boston, MA 02116
T: 617-377-4704 / F: (888) 410-0415

81

Email: joel@skclassactions.com

*Attorneys for Plaintiff*

\* *pro hac vice* forthcoming